**In the Matter of Alphonse PERSICO, Appellant.**

**No. 867, Docket 74–1101.**

United States Court of Appeals, Second Circuit.

Argued Feb. 5, 1974.

Decided Feb. 19, 1974.

---

Nancy Rosner, New York City, for appellant.

Robert G. DelGrosso, Denis E. Dillon, Attys., Dept. of Justice; Edward J. Boyd V, U. S. Atty., E.D.N.Y., for U. S.

Before WATERMAN and MULLIGAN, Circuit Judges, and BRYAN, District Judge.*

WATERMAN, Circuit Judge:

This is an appeal from an adjudication of civil contempt pursuant to 28 U.S.C. § 1826(a) for refusal to answer a question propounded by a grand jury. Appellant refused to answer certain earlier questions on constitutional grounds and was granted "use" and "derivative use" immunity. Then, after answering a few questions, he objected to a particular question and, relying on Gelbard v. United States, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), maintained that the question was derived from electronic surveillance which he claimed was presumptively illegal. The Government eventually acknowledged that the line of questioning the grand jury had been pursuing was a product of the electronic interception of oral communications but strenuously affirmed that the surveillance was conducted under proper court orders and was in complete conformity with the requirements of federal law under 18 U.S.C. §§ 2510–2520. We are thus called upon to decide whether appellant, in defending the contempt action brought against him when he refused, though granted "use" and "derivative use" immunity, to answer before a Grand Jury a question derived from electronic surveillance conducted under court order, has a right in a civil contempt proceed-

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

ing to litigate the legality of that surveillance. We hold that he does not.

The facts in this case are not complex. On January 23, 1974, appellant was called as a witness before a federal grand jury "investigating racketeering influence in legitimate business." Relying on his Fifth Amendment privilege, he initially refused to answer any questions concerning his employment. Thereupon, pursuant to 18 U.S.C. §§ 6002 and 6003 Persico was granted "use" and "derivative use" immunity. At this point appellant continued to be recalcitrant and began to object to questioning with reference to his employment on the ground that the questions were the product of illegal electronic surveillance. The Government requested that Judge Orrin Judd issue a contempt citation for refusal to testify. Judge Judd regarded the request as premature and, not perceiving any connection between the question and the surveillance, ordered Persico to testify under threat of contempt. Persico then answered some questions regarding his lawful employment but refused to respond to a question regarding "any other occupation." This refusal was again based on appellant's contention that the question was a "fruit" of illegal electronic surveillance. The Government, conceding that this question was derived from electronic surveillance, argued that the surveillance, which was conducted pursuant to three court orders, was entirely legal. Judge Judd inspected the court orders in camera, found them to be proper, refused to grant appellant's motion that a suppression hearing be held to test the legality of the surveillance, and renewed his order to testify.

Persico returned to the grand jury where he acknowledged that he did indeed have other business interests, more particularly, an illegal gambling business involving "horses, sports and numbers." His cooperation ceased, however, when he was asked to identify the individuals who worked for him in these surreptitious enterprises.[1] He again grounded

---

1. The immediate questioning which led up to the contempt order followed an admission by Persico that he was a sole operator of an illegal gambling business:

Q. (Mr. DelGrosso) Where is your base of operations today?

A. Before I answer that, can I speak to my counsel, before I answer that question?

Q. Sure, you may.

At this time Mr. Persico left the Grand Jury Room and reentered after consulting with his counsel.

Mr. DelGrosso: Read the question back, reporter.

At this time the question was read back.

A. I—you take them off the street corner. People take bets, you know. So there is really no place, in the house maybe, they'll take it in one day.

Q. Are you the boss of this organization?

A. Yes.

Q. Do you have people working for you?

A. Yes.

Q. You do?

A. Yes.

Q. Who are these people?

A. I guess we have to go back to the Judge again.

Mr. DelGrosso: Okay. We'll go upstairs to the Judge.

Whereupon, Mr. DelGrosso and Mr. Persico left the room and reentered the room without going up to the Judge.

Q. The question was, who were the individuals who worked for you?

A. Can I read this into the record?

Q. Yes, you may.

A. You already told me that my house was bugged last spring.

Mr. DelGrosso: Yes.

A. Now you're asking me who works for my gambling business. You know the answer to that question as a result of electronic surveillance of my home. As a result of electronic surveillance, I feel you're only asking me, for me to refuse to answer, because you know this information from the electronic surveillance in my home.

I still maintain that the electronic surveillance on my home was unlawful and should not be permitted and you should not be permitted to ask me these questions.

Q. Is that it?

A. Yes.

Q. I again ask you, sir, who are the individuals that work for you, and are you refusing to answer that question?

A. Yes.

Q. I ask the Grand Jury foreman to order the witness to answer that question.

The Foreman: You are hereby ordered to answer the questions under the terms of

his objections, inter alia, on the alleged illegality of the electronic surveillance which was the source of the question, saying: "You know the answer to that question as a result of electronic surveillance of my home." Upon this refusal to respond, Judge Judd held Persico to be in contempt and sentenced him to 60 days in jail, subject, however, to immediate release should appellant decide to answer the question. Persico then reinstituted his motion to suppress and claimed the right to examine the court orders and accompanying documents under which the three wiretaps had been authorized. This motion was denied. A concurrent motion for bail pending appeal was likewise unsuccessful. On January 28, 1974, we also denied Persico's separate application to us for bail pending appeal, but, a notice of appeal on the merits having been filed on January 25, we ordered that the appeal be speedily brought on, and it was argued on February 5.

Chapter 119 of Title 18 of the United States Code, entitled "Wire Interception and Interception of Oral Communications," 18 U.S.C. §§ 2510–2520, represents an assiduous congressional effort to balance the individual's right to privacy against the Government's legitimate interest in gathering information necessary for the prosecution of crimes.[2] Integral to the statutory scheme are elaborate precautions taken to insure that electronic surveillance is not used unnecessarily and that when it must be used its duration is narrowly circumscribed. To maximize compliance with the provisions of Chapter 119 by investigative authorities who desire to employ wiretaps and other electronic devices the chapter contains its own "exclusionary rule," 18 U.S.C. § 2515, which provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

The apparently ample breadth of this proscription has been confirmed by Gelbard v. United States, *supra*. In that case the Supreme Court held that in contempt proceedings instituted under 28 U.S.C. § 1826(a) for failure to obey a court order to answer a question be-

---

the power of the grant of immunity and the power of the Grand Jury.

A. Immunity pertains to only me. Is that so?

Q. That's so.

A. It does not pertain to anybody else?

Mr. DelGrosso: No, it does not.

Whereupon Mr. DelGrosso and Mr. Persico then left the Grand Jury chamber and reentered.

Q. The question was, who are the individuals involved in the gambling operation, and do you refuse to answer? You were ordered to do so. You were ordered to do so by the Grand Jury foreman. Is that not correct?

A. Yes.

Q. Are you going to give us those names, sir?

A. Before answering this question, I would like to know whether or not, if I am correct, that you already have this information as a result of illegal bugs in my home?

Mr. DelGrosso: I need not answer any such question. You have been ordered to give those names. If you will give those names, you will not be brought up before the judge. If you will not answer, we will have to go to the judge.

You are going to have to go to the judge, sir? Is that it, sir?

A. Yes, let's go to the judge.

2. The striking of this balance is achieved primarily through the statutory provisions requiring the Government to obtain a court order authorizing the electronic interception. See 18 U.S.C. §§ 2511(1)(a), 2516(1). As might be expected, the statute also contains some express exceptions to this general mandate. See, e. g., 18 U.S.C. §§ 2511(3), 2518 (7).

fore a grand jury, the witness refusing to give the testimony may avail himself of the defense that the question propounded to him violates § 2515 because it was derived from electronic surveillance conducted in violation of Chapter 119. Appellant believes that *Gelbard* controls our adjudication of the facts before us and that before answering questions he believes are the product of electronic interception he is entitled to have a hearing as to whether the interception was in violation of Chapter 119. Insofar as *Gelbard* permits a grand jury witness to refuse to answer a question derived from concededly unlawful electronic surveillance and then successfully to defend a contempt proceeding for so refusing, we agree with appellant. *Gelbard* does indeed govern that narrow situation. The holding there, however, was expressly predicated on an assumption by the Court "that the communications were not intercepted in accordance with the specified procedures and thus that the witnesses' potential testimony would be 'disclosure' in violation of Title III. See 18 U.S.C. §§ 2511(1), 2517(3)." The Court left undecided the issue of "whether [witnesses] may refuse to answer questions if the interceptions of their conversations were pursuant to court order." Id. at 61 n. 22, 92 S.Ct. at 2368. Here appellant urges that the mere existence of a court order should not preclude the witness from fully litigating in the contempt proceeding the lawfulness of the surveillance. We disagree.

Although the *Gelbard* footnote technically left "undecided" the scope of any inquiry designed to determine the legality of a court-ordered surveillance, a careful examination of that decision is revealing. Mr. Justice White in a concurring opinion supplied the decisive vote for the majority's reversal of the Ninth Circuit's holding in *Gelbard*, 443 F.2d 837 (1971). In that opinion he intimated, 408 U.S. at 70, 92 S.Ct. at 2372, 33 L.Ed.2d 179, that when, during grand jury proceedings, the Government *does* produce a court order the traditional notion that the functioning of the grand jury system should not be impeded or interrupted could prevail at that time over the witness's interest in exploring in depth the validity of the surveillance.

Where the Government produces a court order for the interception, however, and the witness nevertheless demands a full-blown suppression hearing to determine the legality of the order, there may be room for striking a different accommodation between the due functioning of the grand jury system and the federal wiretap statute. Suppression hearings in these circumstances would result in protracted interruption of grand jury proceedings. At the same time, prosecutors and other officers who have been granted and relied on a court order for the interception would be subject to no liability under the statute, whether the order is valid or not; and, in any event, the deterrent value of excluding the evidence will be marginal at best.[3]

---

3. The Supreme Court's continuing concern over potential obstructions to the expeditious performance of the grand jury's function is illustrated by its recent decision in United State v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), in which the Court held that a grand jury witness cannot refuse to answer questions on the ground that they are the product of unlawful searches and seizures. The Court, echoing the concerns expressed in Mr. Justice White's concurring opinion in Gelbard v. United States, supra, there stated:

Permitting witnesses to invoke the exclusionary rule before a grand jury would precipitate adjudication of issues hitherto reserved for the trial on the merits and would delay and disrupt grand jury proceedings. Suppression hearings would halt the orderly progress of an investigation and might necessitate extended litigation of issues only tangentially related to the grand jury's primary objective. The probable result would be "protracted interruption of grand jury proceedings," Gelbard v. United States, 408 U.S. 41, 70 [92 S.Ct. 2357, 33 L.Ed.2d

Congressional concern over disruption of smooth and efficient operation of the grand jury system is found in the legislative history of Chapter 119, also. Senate Report No. 1097, printed in 1968 U.S.Code Cong. & Admin.News p. 2112, appears to controvert Persico's contention that in defending the contempt proceedings resulting from his refusal to answer a question before the grand jury he is entitled to a suppression hearing. Though the legislative history recognizes that illegally obtained wiretap evidence, or the fruits thereof, must be excluded from any proceedings before a grand jury, the history further discloses that the exclusionary rule "must, of course, be read in light of section 2518(10)(a) discussed below, which defines the class entitled to make a motion to suppress." Senate Report No. 1097, *supra* U.S.Code Cong. & Admin.News 1968, at p. 2185. Most crucial to our task, therefore, is the congressional understanding of the effect of § 2518(10)(a) on the grand jury process:

> "Paragraph (10)(a) provides that any aggrieved persons, as defined in section 2510(11), discussed above, in any trial hearing or other proceeding in or before any court department, officer, agency, regulating body or other authority of the United States, a State, or a political subdivision of a State may make a motion to suppress the contents of any intercepted wire or oral communication or evidence derived therefrom. This provision must be read in connection with sections 2515 and 2517, discussed above, which it limits. It provides the remedy for the right created by section 2515. *Because no person is a party as such to a grand jury proceeding, the pro-vision does not envision the making of a motion to suppress in the context of such a proceeding itself.* Normally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforcible by an individual. (Blue v. United States, [United States v. Blue] 86 S.Ct. 1416, 384 U.S. 251 [16 L.Ed.2d 510] (1965).) There is no intent to change this general rule. It is the intent of the provision only that when a motion to suppress is granted *in another context,* its scope may include use in a *future* grand jury proceeding. . . ." Senate Report No. 1097, *supra* U.S.Code Cong. & Admin.News 1968, at p. 2195. (Emphasis supplied).

As noted, though Congress prescribed that illegal wiretap evidence must be excluded from all grand jury proceedings, hearings to suppress evidence were not to be permitted during such proceedings. These seemingly inconsistent policy determinations can be reconciled only by interpreting the statute as requiring exclusion only when it is clear that a suppression hearing is unnecessary, as when the Government concedes that the electronic surveillance was unlawful or when the invalidity of the surveillance is patent, such as, for example, when no prior court order was obtained, or when the unlawfulness of the Government's surveillance has been established in a prior judicial proceeding. In these situations both statutory policies—the exclusion of illegally acquired evidence and the maintenance of unimpeded grand jury proceedings—are served. But where illegality is claimed and, if established, can be established only by way of a plenary suppression hearing, one im-

---

179] (1972) (White, J., concurring), effectively transforming them into preliminary trials on the merits. In some cases the delay might be fatal to the enforcement of the criminal law. Just last Term we reaffirmed our disinclination to allow litigious interference with grand jury proceedings:
"Any holding that would saddle the grand jury with mini-trials and preliminary

showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal law." United States v. Dionisio, 410 U.S. 1, 17 [93 S. Ct. 764, 35 L.Ed.2d 67] (1973).

94 S.Ct. at 620–621 (footnotes omitted; citations partially omitted).

portant aim of the legislation would be frustrated.

Appellant, however, referring also to the language of the legislative history quoted above, would have us find that the contempt proceeding here is a proceeding in "another context" and therefore the general proscription against hearings upon motions to suppress in grand jury proceedings does not prevent motions to suppress and hearings thereon in contempt proceedings arising out of a witness's refusal to answer a grand jury's question. While appellant's argument is a superficially plausible one, his reasoning in support of the argument is unrealistic. The contempt mechanism employed here to coerce testimony is so intimately connected with the grand jury proceedings in which the testimony is desired as to be really a part of those proceedings. Obviously, any expansion of the breadth of inquiry permissible in a contemporaneous contempt proceeding initiated because of the recalcitrance of a grand jury witness necessarily inhibits the smooth functioning and efficient operation of that grand jury.

Moreover, Congress could not have intended that a *contemporaneous* civil contempt proceeding such as the one involved here—a proceeding whose only purpose is to invite a recalcitrant witness to cooperate with the grand jury—is a proceeding "in another context" rather than in the context of the grand jury's proceedings. · That the congressional intent was so limited is demonstrated by the language of the Senate Report that the scope of a suppression order granted "in another context" may extend to a "future grand jury proceeding," that is, may extend only to a grand jury proceeding which clearly postdates the proceeding "in another context." Therefore the term "another context" could not have been intended to include a hearing on a contempt citation contemporaneous with the grand jury proceeding.

■■ We hold that in contempt proceedings initiated when a witness who has been granted "derivative use" immunity refuses to answer questions propounded by a grand jury because he claims he is entitled to a hearing to ascertain whether the questions posed are the product of unlawful electronic surveillance the witness is not entitled to a plenary suppression hearing to test the legality of that surveillance. We hold that the refusal would be permissible only if there is an absence of a necessary court order or if there is a concession from the Government that the surveillance was not in conformity with statutory requirements or if there is a *prior* judicial adjudication that the surveillance was unlawful. Here there were three court orders. Inasmuch as Judge Judd conducted an in camera inspection to ascertain whether they complied with the statute and found that they did comply, Persico received all that he was entitled to receive. He therefore has no basis for complaint that his motions for suppression hearings were denied.

■ Persico also asserts that the procedure provided for by Rule 42 of the Federal Rules of Criminal Procedure establishes the procedure which should have been, but was not, followed in this case. This contention is without merit. Rule 42 applies only in those contempt proceedings in which the purpose is punitive, i. e., in criminal contempt proceedings. Here Persico has the power to secure his own release from confinement by agreeing to answer the question he refused to answer. Thus, the purpose of holding Persico in contempt was to coerce him to answer the grand jury's question and was not to punish him for reprehensible conduct. Persico was only a recalcitrant witness, his contempt was manifestly civil in character, and, as such, the summary procedure and the limitation of permissible confinement set forth in 28 U.S.C. § 1826 was, and is, applicable here.

■ As his final point, appellant claims that the immunity conferred upon him, *as explained to him by the Government,* was not co-extensive with his priv-

ilege against self-incrimination and therefore he could not be held in contempt for refusing to testify. The Government's explanation of the "use" and "derivative use" immunity conferred on Persico under 18 U.S.C. § 6002 was not the epitome of either precision or lucidity. Nevertheless, it probably sufficiently apprised Persico of the extent of the immunity he had been granted; at the very least its extent was implicit in the prosecutor's remark to Persico that he could be prosecuted for crimes involved in matters about which he was testifying "if the government should show independent evidence."[4] In any event, we are not persuaded that appellant was misled inasmuch as his experienced and competent counsel must have been fully aware of the extent of § 6002 immunity. For instance, she acknowledges that she previously challenged the alleged technical insufficiency of the Government's explanation of the scope of the immunity, presumably on the ground that that explanation appeared to attribute to § 6002 immunity a narrowness incompatible with both the plain meaning of and the Supreme Court's understanding of the section, see Kastigar v. United States, 406 U.S. 441, 453, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), cited in her brief on appeal. We cannot believe that she ever understood that the Government intended to confer anything less than the full "use" and "derivative use" immunity "explicitly" conferred by § 6002. See Kastigar v. United States, *supra* at 453, 92 S.Ct. 1653. She objected to the explanations given to Persico; but whatever semantic deficiencies, if any, there may have been in those explanations they did not prevent her from outlining to her client the extent of the immunity conferred upon him.

We affirm the order below adjudging appellant in civil contempt and directing his imprisonment.

4. See transcript of January 23, 1974 proceedings, p. 20.