**In re Ellen GRUSSE and Marie Theresa Turgeon.**

**Civ. No. N–75–42.**

United States District Court,
D. Connecticut.

Feb. 19, 1975.

See also, D.C., 402 F.Supp. 1239.

William F. Dow III, Asst. U. S. Atty., New Haven, Conn., for petitioner.

David N. Rosen, Michael Avery, Mary Ellen Wynn, New Haven, Conn., for respondents.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

The Government has moved for an order adjudicating two persons, Marie Turgeon and Ellen Grusse, in contempt for failing to answer questions asked at a session of a Federal Grand Jury. 28 U.S.C. § 1826. The witnesses were called before the Grand Jury on January 28, 1975, at which time they declined to answer questions on various grounds including their privilege against self-incrimination. On February 13, 1975, the Government obtained from this Court an order granting the witnesses use immunity pursuant to 18 U.S.C. § 6003. That same day the witnesses returned to the Grand Jury and were asked questions concerning their knowledge of persons who may have participated in Connecticut with two persons who are now fugitives under a Federal indictment in the District of Massachusetts on charges stemming from the robbery of a federally-insured bank, in which a police officer was shot and killed. The witnesses refused to answer the questions, invoking various constitutional amendments as well as the claim that the questioning resulted from illegal electronic surveillance. The following day, February 14, 1975, the Government applied to this Court for an order compelling the witnesses to answer the specific questions they had been asked and declined to answer the previous day. Those questions are set out in the margin.[1] After a

---

1. The questions asked of Ellen Grusse were: 1. Do you know or are you acquainted with SUSAN EDITH SAXE, who uses the alias of LENA PALEY, or KATHERINE ANN POWER, who uses the alias of MAY KEL- LY, and if so have you seen them in Connecticut and do you know where they resided or stayed when they were in Connecticut and also when is the last time you spoke with either or both of these individuals?

hearing, the requested order was issued. The witnesses then returned to the Grand Jury and again persisted in their refusal to answer the same questions previously asked. Still later in the afternoon of February 14, the witnesses were presented again in Court and were orally advised by this Court to show cause on February 18, 1975, why they should not be adjudicated in contempt for their failure to answer the Grand Jury's questions. On February 18, the witnesses were heard through counsel and submitted extensive memoranda outlining the grounds alleged to justify their refusal to answer questions. On January 28 and at all subsequent times, the witnesses were represented by counsel.

1. The witnesses contend initially that they and their attorneys have been subjected to illegal electronic surveillance, that the Grand Jury questioning is or may be derived therefrom, and that such occurrences are a defense to contempt citations for failure to testify. *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). In support of this claim, there have been submitted affidavits by the witnesses and their attorneys (and other attorneys who, though they have not appeared for the witnesses, are alleged to be cooperating attorneys with the attorneys who have appeared). These affidavits allege that the witnesses and attorneys believe they have been subjected to illegal electronic surveillance, *i. e.*, wiretapping. The claims are based on conclusory statements that the questions asked must have come from such surveillance, as well as more particularized claims to telephone malfunctioning and unusual sounds heard on telephones. No expert testimony was presented linking the telephone sounds or malfunctioning to a likelihood of wiretapping.

■ In this Circuit, the allegation of wiretapping, whether or not particularized, is apparently sufficient to trigger the Government's obligation to "affirm or deny" the alleged unlawful act. 18 U.S.C. § 3504. *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974); see *United States v. Vielguth*, 502 F.2d 1257 (9th Cir. 1974).

■ The Government has sought to discharge its burden under § 3504 by filing

2. Have you ever met or come into contact with or had conversation with either SUSAN EDITH SAXE, with the alias of LENA PALEY or KATHERINE ANN POWER, with the alias of MAY KELLY, at 118 Babcock Street in Hartford; 7 Putnam Heights in Hartford during the years 1973 through the present date, and if so where, when and with whom did you have those discussions or conversations?

The questions asked of Marie Turgeon were:

1. Whether or not you appeared before this grand jury on the 28th day of January, 1975?

2. Do you know KATHERINE ANN POWER, also known as MAY KELLY and SUSAN EDITH SAXE, also known as LENA PALEY, photographs of whom are shown to you which have been marked as WD 1 for SAXE and WD 2 for POWER?

3. When you last saw either KATHERINE ANN POWER, also known as MAY KELLY or SUSAN EDITH SAXE, also known as LENA PALEY, where that was, when that was, who they were with, when you saw them, and where they were residing at the time?

4. At some point in time you lived at 23 Marshall Street in Hartford and KATHERINE ANN POWER, also known as MAY KELLY visited you there, most likely during the calendar year 1974. Indicate to the grand jury whether or not that is so and if so when she came there, who she was with, how long she stayed and where she was residing at the time?

5. During the course of their stay in Connecticut, both KATHERINE ANN POWER, also known as MAY KELLY and SUSAN EDITH SAXE, also known as LENA PALEY, made known to certain acquaintances the fact that they were fugitives and charged with certain crimes. Do you know the individuals to whom they gave that information?

6. Have you heard from or communicated with either KATHERINE ANN POWER, also known as MAY KELLY, and/or SUSAN EDITH SAXE, also known as LENA PALEY within the past three months and if so where did that communication take place and do you know the present whereabouts of either or both of them?

an affidavit of the Assistant United States Attorney responsible for examining these witnesses before the Grand Jury. That affidavit represents that inquiry has been made "of the appropriate federal authorities" to determine whether there has been electronic surveillance of the witnesses or their attorneys, and that "based on the results of such inquiry . . . there has been no electronic surveillance" of the individuals named or on their premises.[2]

The witnesses were permitted to examine the Assistant United States Attorney at the hearing on February 18. They established that his inquiry had been directed solely to a Special Agent of the Federal Bureau of Investigation with supervisory responsibilities for this matter.

The witnesses dispute the adequacy of the Government's affidavit of denial. Moreover, they have submitted a list of names and telephone numbers that they assert should be checked by the Government for possible wiretapping. Finally, they assert the right to examine the officials who did the checking on which the Assistant United States Attorney's denial was based.

The form and scope of the Government's denial of wiretapping is similar to what has been deemed sufficient by the Court of Appeals for this and three other circuits. *United States v. Smilow,* 472 F.2d 1193 (2d Cir. 1973); *Beverly v. United States,* 468 F.2d 732 (5th Cir. 1972); *In re Grumbles,* 453 F.2d 119 (3d Cir. 1971); *In re Marx,* 451 F.2d 466 (1st Cir. 1971).

It cannot be said with assurance that the submission of the affidavit of denial conclusively puts to rest all possibility of illegal electronic surveillance, as various cases, including *Smilow,* unhappily illustrate. The risk of undisclosed illegal wiretapping arises primarily from two possibilities. First, the absence of cross-examination of those who conducted the search of Government records leaves open the possibility that the search, even within the agency that undertook it, was not thorough. Secondly, there is the possibility that wiretapping was done by an agency other than the F. B. I. and that the results of such tapping found their way into the files of the F. B. I. The question is whether the denial is adequate to obligate the witnesses to respond to the Grand Jury's questions or face contempt sanctions. On this issue, the decision in this Circuit in *United States v. Persico,* 491 F. 2d 1156 (2d Cir. 1974), is instructive. The Court there held that where wiretapping had occurred pursuant to court order, a witness could not litigate the validity of the tap before responding to Grand Jury inquiry. The Court emphasized the legitimate concern of the Grand Jury for conducting its business *promptly. Persico* obviously demonstrates that the Second Circuit is willing to require witnesses to respond to Grand Jury questions even though all possibility of illegal wiretapping has not been ruled out. Nothing has been presented in this hearing to indicate that the risk that a denial of wiretapping in the form presented in the Government's affidavit

---

2. The affidavit reads as follows:
WILLIAM F. DOW, III, being duly sworn, does depose and say:
1. I am an Assistant United States Attorney assigned to the New Haven office of the United States Attorney for the District of Connecticut;
2. I have inquired of the appropriate federal authorities to determine whether there has been any electronic surveillance or interception of the wire or oral communications of Ellen Grusse, Marie Theresa Turgeon, Michael Avery, David Rosen, Diane Polan, Rhonda Copelon or Doris Peterson or any electronic surveillance or interception of wire or oral communications occurring on their premises, whether or not they were present or participated in those conversations;
3. Based on the results of such inquiry I hereby state that there has been no electronic surveillance or interception of wire or oral communications of those individuals named in Paragraph Two and that there has been no electronic surveillance or interception of oral or wire communications occurring on their premises.

will later turn out to be incorrect is any greater than the risk that a court-ordered wiretap will later turn out to be invalid on any of the many grounds available for attacking such orders. The willingness to accept some risk of illegal wiretapping in the context of a contempt proceeding involving a Grand Jury witness seems to be grounded on the fact that requiring a witness to respond after obtaining use immunity is a less drastic assertion of governmental power than prosecuting a person for a criminal offense. In the latter situation the risk tolerated by *Persico* would plainly not be tolerated; a suppression hearing would be held.

Here the Government has made a denial of wiretapping, based upon the report of the agency investigating the matter at hand. The denial covers the witnesses and the names of the attorneys they furnished the Government. It covers the named persons and "their premises." I find this denial sufficient to satisfy 18 U.S.C. § 3504, in the context of a contempt proceeding against an immunized Grand Jury witness, under the current standards prevailing in this Circuit.

■ The witnesses' submission of additional names and telephone numbers does not require a further response from the Government. The list submitted gives no identification of the names of those persons not previously identified to the Government as attorneys for the witnesses. Moreover, there is no specification on the list of the reason for checking all of the telephone numbers given for the names that were checked. For example, for the witness Ellen Grusse, 14 telephone numbers are listed.

2. Challenge is made to the composition of the Grand Jury. *Cf. United States ex rel. Chestnut v. Criminal Court,* 442 F.2d 611 (2d Cir. 1971). The claim is based on alleged unconstitutional discrimination against Blacks and women.

■ The claim respecting Blacks is based on the same data that were considered by the Second Circuit in *United States v. Jenkins,* 496 F.2d 57 (2d Cir. 1974), affirming a conviction from this District. While that same data have been given a somewhat more sophisticated analysis in testimony later presented to this court in *United States v. Gonzalez,* Criminal No. B–115 (D.Conn. May 22, 1974), the data were before the Court of Appeals in *Jenkins,* and the affirmance there forecloses further consideration of the issue in this Court.

■ The claim concerning discrimination against women is not readily understood. The witnesses' brief alleges that the same data presented in *Jenkins* (though not litigated on this point) show that of 455 persons selected or rejected for the venire, about 60% were female. The brief then asserts "from that total number, however, only 28% were selected for service, compared to 45% of the men." It is not clear what numbers were used to compute the 28%. In any event, no unconstitutional discrimination has been shown. The witnesses do not cite any court rule or practice that prevents or in any way hinders women from serving on juries. It may well be that women seek bona fide excuse from jury service in greater numbers than men on the basis of a need to care for young children at home. The honoring of such excuses does not deny these witnesses any constitutionally protected rights. Taking judicial notice of the records of this Court, the Court notes that of the 20 members of the Grand Jury presently serving from the 23 originally impaneled, there are eight women and twelve men.

■ 3. The witnesses challenged the grant of use immunity and also resist the contempt citation on the ground that the Government has not demonstrated compliance with the guidelines which Attorney General Kleindienst advised Chairman Celler of the House Judiciary Committee by letter dated November 30, 1971, were being used to govern decisions by Department of Justice personnel in deciding whether to seek use im-

munity. A demonstration of compliance with these guidelines has been rejected by the Fifth Circuit, *In re Tierney*, 465 F.2d 806 (5th Cir. 1972), and by this Court, *In re Cardassi*, 351 F.Supp. 1080 (D.Conn.1972).

■ 4. The witnesses next urge that the immunity order was invalid and that they should therefore not be cited for contempt because the use immunity order was not accompanied by their requested form of protective order.[3]

The order sought would have required the Government to certify the presently existing evidence implicating the witnesses in the matters under inquiry, barred subsequent prosecution of the witnesses on any evidence other than what was thus certified, prohibited Government officials from making investigative use of the witnesses' compelled testimony, and required the witnesses to be furnished a copy of their testimony.

The first portion of the requested order follows a suggestion viewed favorably in *Goldberg v. United States*, 472 F.2d 513 (2d Cir. 1973). The suggestion, however, was directed to prosecutors, and not to District Courts establishing conditions under which use immunity could be conferred. If the Government has any thought of one day prosecuting these witnesses, the requested certification would certainly aid it in establishing its burden of demonstrating that no use or derivative use was made of the compelled testimony. But the infrequency of prosecution of witnesses

given use immunity may well prompt the Government not to accept the *Goldberg* suggestion as a routine practice. The Government today elected to file, under seal, the evidence presently available against the witnesses.[4]

The request that the Government be barred from prosecuting the witnesses on any evidence other than what is now certified would transform use immunity into a modified form of transactional immunity contrary to *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 345 (1973). If evidence hereafter comes to the Government's attention implicating the witnesses in criminal activity, *Kastigar* requires the Government to sustain its burden of proving a source independent of the compelled testimony, but if that burden is sustained, use of the new evidence is not barred.

■ The request for a transcript of compelled testimony would surely be appropriate if any action is taken against the witnesses, either for perjury or some other offense, but until such action appears likely, the request is premature.

For these reasons the request for a protective order was denied. The Government has represented that it will not seek any indictment of the witnesses from the same Grand Jury to which they testify.

■ 5. Finally, the claim is made that the compulsion of answers from these witnesses constitutes an abuse of the Grand Jury function. The witnesses

---

3. The witnesses also challenged the immunity order on the ground that they lacked sufficient time to oppose its issuance. They were informed on their initial appearance before the Grand Jury that use immunity would be applied for in the event they invoked their privilege against self-incrimination. It was sixteen days later that the Government applied for the use immunity order. Moreover, the witnesses have now had time to prepare memoranda totaling 64 pages outlining their grounds in opposition to the contempt citation.

4. At the resumed hearing on the contempt application this morning, the Government

also submitted to the Court for *in camera* inspection, along with its certification of evidence, an affidavit that has been included in Court Exhibit 1 and placed under seal for inspection only by a reviewing court. This Court is satisfied that the content of the affidavit in Court Exhibit 1 has no relevance whatever to any of the matters presently at issue, and that disclosure to the parties is not required. The affidavit makes no mention of the witnesses nor contains any reference to anything affecting them or their interests.

allege that the Government is interested only in finding the present whereabouts of the two fugitives from the Massachusetts robbery and otherwise building its case against those fugitives.

The Government informed the witnesses, with the concurrence of the Grand Jury foreman, that the Grand Jury was investigating possible violations in the District of Connecticut of statutes punishing accessories after the fact, 18 U.S.C. § 3, and those who harbor fugitives, 18 U.S.C. § 1071, in connection with the Massachusetts bank robbery.

The questions put to the witnesses demonstrate on their face that they properly relate to the possible violations in this District that the Government represented were being pursued. That the answers might also lead to the identification of the whereabouts of two fugitives does not bar the Grand Jury from hearing them.

■ More generally, abuse of the Grand Jury function is alleged because the witnesses were subpoenaed after they declined to answer questions asked by F. B. I. agents, and because of alleged harassment. Since the questions legitimately relate to possible violations of Federal law in this District, they cannot be avoided simply because they were initially asked by F. B. I. agents. The claim of harassment is without merit. It is based on affidavits of the witnesses that do no more than indicate that the F. B. I. has asked members of the witnesses' families the same type of questions being asked the witnesses. No showing has been made that the questioning, previously pursued by the F. B. I., or presently pursued by the Grand Jury, is searching out intimate personal details as to which, in some circumstances, a right of privacy might thwart an otherwise legitimate inquiry into criminal violations, or at least place upon the Government some burden of demonstrating a specific need for the answers.

■ Since the grounds for declining to answer the Grand Jury's questions are without merit,[5] the witnesses are properly subject to contempt sanctions, and since they have stated to the Court today that they will persist in refusing to testify even though their objections have been overruled, they are adjudicated in civil contempt and remanded to the custody of the United States Marshal until such time as they elect to purge their contempt by testifying, but in no event for longer than the expiration of the term of the Grand Jury on April 1, 1975.[6]

5. Though not briefed, the witnesses urged at oral argument that use immunity was unlawful as to them because of the circumstances that they are close friends who presently live together. This was alleged to create a "community of interest" that would be impaired in the event the compelled testimony of one implicated the other. The claim is without merit.

6. Following the adjudication of contempt, the witnesses applied for bail pending appeal. See 28 U.S.C. § 1826(b). The statute's requirement of disposition of an appeal within thirty days conflicts with the normal scheduling of appeals pursuant to the Federal Rules of Appellate Procedure. In these circumstances, it seems appropriate to permit the Court of Appeals to determine for itself what scheduling it wishes to establish for the hearing of the appeal the witnesses intend to take and to determine whether the witnesses should be released from confinement pending disposition of the appeal. Accordingly, this Court stayed execution of its order remanding the witnesses to the custody of the United States Marshal until Monday, February 24, 1975, at noon, the stay being conditioned upon the witnesses posting a $10,000 non-surety bond, and remaining within the District of Connecticut and maintaining daily telephone contact with their attorneys. This will permit the witnesses to apply promptly to the Court of Appeals for further relief, at which time that Court can either terminate or extend the stay or make such other disposition as it deems appropriate.