**In re Grand Jury Subpoena of Martin FLANAGAN.**

No. CV–81–3978.

United States District Court, E. D. New York.

Feb. 10, 1982.

Edward R. Korman, U. S. Atty., Brooklyn, N. Y., David V. Kirby, Asst. U. S. Atty., Brooklyn, N. Y., of counsel, for plaintiff.

Richard W. Levitt, New York City, for defendant.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This is a contempt proceeding brought on by the Government to compel a grand jury witness to answer questions relating to an alleged conspiracy to possess, transport, and smuggle firearms and ammunition from the United States to Great Britain and Ireland in violation of several federal firearm statutes. *See, e.g.,* 26 U.S.C. § 5861, 22 U.S.C. §§ 2778(b)(2) and (c).

*Background.*

On July 20, 1981, a subpoena was issued requiring Martin Flanagan, a dual citizen [1]

---

1. Under the law of the Republic of Ireland, Irish citizenship is permanently maintained even if one renounces it to qualify for citizen-

of the United States and the Republic of Ireland, to provide information to a federal grand jury concerning an alleged gun-running scheme. Mr. Flanagan is said to be an unindicted co-conspirator in this gun-running scheme. He stated to the Court that he has lived in the United States for approximately twenty-one years and is currently employed by Western Union as a technician. During the past twenty-one years, Mr. Flanagan has travelled back and forth to Ireland, generally taking such trips once a year for vacation purposes.

On December 4, 1981, an immunity order was signed by this Court.[2] This order required Mr. Flanagan to testify before the grand jury, but granted him the customary immunity from the use of his testimony in the state and federal courts of the United States. Flanagan, however, moved on December 9, 1981, to quash the subpoena on two separate grounds: (1) that the grand jury questions were based on evidence derived from illegal electronic surveillance and (2) that, although the order of immunity clothes him with "use and derivative use immunity" in the United States, he would still be subject to prosecution in Northern Ireland, the Republic of Ireland or Great Britain.

On December 18, 1981, Mr. Flanagan appeared before the grand jury and was asked the following question: "Calling your attention to the month of April of this year, were you assigned any particular vehicle to drive during that month, sir?" (Transcript, U.S. Grand Jury, E.D.N.Y., December 18, 1981, testimony of Martin Flanagan at 2 (hereinafter cited as "G.J.Tr.")) Upon his refusal to answer this question, Flanagan was informed that he was required to answer because he had been granted immunity pursuant to 18 U.S.C. §§ 6002, 6003. Nevertheless, Mr. Flanagan continued to refuse to answer this and other questions

by the Government. These additional questions delved into whether Mr. Flanagan knew six particular men already indicted in the alleged gun-running scheme, and whether Flanagan had "ever engaged in any activities with any other of the aforementioned six men in transporting arms or ammunition in the Eastern District of New York which includes Brooklyn, Queens, Staten Island, Nassau and Suffolk Counties." G.J.Tr. at 5–6. In light of Mr. Flanagan's continued refusal to answer the questions, the Government moved under 28 U.S.C. § 1826(a) to compel him to testify.

### I. *Illegal Electronic Surveillance.*

Mr. Flanagan first argues that he should not be compelled to answer the Government's questions because they were derived from illegal wiretaps. The Court rejects this argument.

Certain wiretaps utilized by the Government in the gun-running investigation were authorized by the Foreign Intelligence Surveillance Court pursuant to the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1801, *et seq.* The Government has represented to this Court that these wiretaps were not directed at Mr. Flanagan nor did they intercept any communications to which Mr. Flanagan was a party. In the Court's view—although the Government has not raised the issue—this creates a serious threshold question as to whether Mr. Flanagan has standing to challenge the wiretaps.

■ Under FISA, only an "aggrieved person," defined as "a person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance," may challenge the legality of a wiretap. 50 U.S.C. § 1801(k).

---

ship in another country. Irish Nationality and Citizenship Act of 1956, Part 4, Section 21.

2. 18 U.S.C. § 6003(b)(2) specifically authorizes the Government to seek an immunity order where, on the basis of the privilege against self-incrimination, the witness has refused or is likely to refuse to testify or provide informa-

tion. See *United States v. Dingle*, 546 F.2d 1378 (10th Cir. 1976), and *United States v. Braasch*, 505 F.2d 139 (7th Cir. 1974), which upheld the procedure of seeking an immunity order prior to the witness' actual refusal to testify before the grand jury.

This may be contrasted with the general wiretap statute which defines an aggrieved person as "a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11).

Although the FISA definition of "aggrieved person" appears broader than the general wiretap definition, the legislative history of FISA indicates that the FISA definition "is to coincide with the definition of 'aggrieved person' in section 2510 of title III." See S.Rep.No.95–604, 95th Cong., 2d Sess. 56–58 (1978), reprinted in [1978] U.S. Code Cong. & Ad.News 3904, 3957–3959. Indeed, clarifying the FISA definition, the Senate Report states that the "subject" of electronic surveillance is "an individual who was a party to the intercepted communication or was a person against whom the interception was directed." Id.

Given this history, the Court is reluctant to conclude that the term "aggrieved person" has a different meaning in the two wiretap statutes. Accordingly, I hold that the term should be interpreted identically under both statutes and that, if Mr. Flanagan lacks standing under 18 U.S.C. § 2510 (general wiretap statute), he also lacks standing under 50 U.S.C. § 1801(k) (FISA).

■ It is beyond argument that Flanagan lacks standing under the general wiretap statute. Under the customary constitutional rules, a party lacks the standing to assert the constitutional rights of another person. In the context of wiretapping, the rule has crystallized that the only persons with standing to suppress the fruits of an illegal wiretap are parties at whom the wiretaps were directed, parties to the call that was intercepted, or parties owning the premises where the conversations were intercepted. Alderman v. United States, 394 U.S. 165, 174–76, 89 S.Ct. 961, 966–68, 22

L.Ed.2d 176 (1969); United States v. Civella, 648 F.2d 1167, 1172 (8th Cir. 1981); United States v. Fury, 554 F.2d 522, 525–26 (2d Cir. 1977), cert. denied, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978). By attempting to suppress evidence obtained by a wiretap that was not directed at him and which did not pick up any of his conversations, Flanagan seeks to vicariously assert the rights of others. This he may not do. See Alderman v. United States, 394 U.S. at 174–75, 89 S.Ct. at 966–67; United States v. Payner, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980); Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

■ Even if we assume that the standing rules of FISA are broader than the ordinary standing rules, and that Flanagan has standing, his refusal to testify before the grand jury on grounds of illegal electronic surveillance is without merit. Section 106(e) of FISA provides for the suppression of evidence derived from electronic surveillance only when (1) the information was unlawfully acquired; or (2) the surveillance was not made in conformity with an order of authorization or approval. Section 1806(f) then prescribes the exclusive procedures to be followed when an aggrieved person moves to suppress what he claims are the fruits of an illegal wiretap.[3] S.Rep. No.95–604, supra at 57. Under subdivision (f), neither a defendant nor a grand jury witness has the right to an adversarial suppression hearing once the Attorney General files an affidavit asserting that such a hearing would harm the national security of the United States. Such an affidavit was filed in connection with the FISA wiretaps in this case. Hence, section 1806(f) mandates that the determination of whether the electronic surveillance was lawfully authorized be made by having the District Court re-

---

3. Section 1806(f) states that
"whenever any motion or request is made by an aggrieved person pursuant to any other statute or rule of the United States (in this case, 18 U.S.C. § 2515) ... to discover, obtain, or suppress information evidence or information obtained or derived from electronic surveillance under this Act, the United States district court ... shall, notwithstanding any other law, ... review in camera and ex parte the application, order, and such other materials ... to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted."

view, ex parte and in camera, the surveillance order and accompanying application.[4]

Accordingly, I have reviewed the Government's application for the FISA wiretap. It contains a court order authorizing the electronic surveillance, and, on its face, follows the procedures mandated in 50 U.S.C. § 1804.[5] Consequently, I find that the application fully satisfies the FISA procedures.[6]

This, however, does not end the inquiry as to whether there was illegal surveillance. Flanagan argues further that there may have been other illegal wiretaps installed without the blessing of a court order by other federal law enforcement agencies operating lawlessly, unknown to the United States Attorney. He maintains that in the absence of sworn, written representations by the prosecutor stating which Federal agencies had been consulted about illegal electronic surveillance, the Government has failed to satisfy its burden under 18 U.S.C. § 3504. *United States v. Toscanino*, 500 F.2d 267, 281 (2d Cir. 1974).

■ On December 9, 1981, at a hearing before me, the FBI agent in charge of the electronic surveillance in question testified under oath that, as far as he was aware, only the FBI and the United States Customs Service had participated in the investigation. He knew only of the electronic surveillance currently objected to by Mr.

Flanagan, and stated that he was unaware of any unlawful electronic surveillance used in this case. Although the prosecutor's own oral statements might be insufficient under *Toscanino*, any such insufficiency was cured by the sworn testimony of the FBI agent in charge of the investigation. *See In re Millow*, 529 F.2d 770, 774 (2d Cir. 1976); *United States v. Grusse*, 515 F.2d 157, 159 (2d Cir. 1975) (Lumbard concurring).

As Judge Lumbard cogently argued in his concurring opinion in *United States v. Grusse*, 515 F.2d at 159 (2d Cir. 1976):

It must be remembered that any electronic surveillance by the government is relevant only if it is somehow used in formulating questions that the grand jury intends to ask. Thus, surveillance conducted by the government, the results of which were not known to the agents investigating this case, would not be relevant .... I think the assistant United States attorney handling a case and the FBI agent in charge of the investigation of a case are the two people most likely to know if the fruits of any electronic surveillance were used to gain information on which the grand jury would base its questions. *Id.*

Accordingly, Mr. Flanagan's first objection is overruled; he may not refuse to testify on grounds of illegal electronic surveillance.

4. This procedure has been followed in at least two instances. *See United States v. Belfield,* Misc. 81–0215 (D.D.C. Oct. 22, 1981), and *United States v. Bell,* 81 Crim. 679 (D.C.Ca. Sept. 23, 1981).

5. 50 U.S.C. § 1804 requires that the application include, *inter alia,* the identity of the Federal officer making the application, the authority of the Attorney General to make the application and his approval of such application, the identity of the target(s), a statement of facts outlining the information relied upon by the Government that the target is a "foreign power" or "agent of a foreign power" within the meaning of FISA as well as a description of the facilities at which the electronic surveillance is directed which are used or being used by such (agent of) foreign power, a statement of the proposed minimization procedures, adequate certifications that the information sought is foreign intelligence information, and a statement of

facts concerning any previous applications involving the same persons and facilities.

6. It may be worth noting that even under the general wiretap provisions of 18 U.S.C. § 2510, *et seq.,* Flanagan has received his procedural due. Under that statute, if the Government affirms that the surveillance was authorized in accordance with statutory procedures, the witness has no right to test the sufficiency of the affirmation in a suppression hearing. He must testify or face contempt. *United States v. Petito,* 671 F.2d 68 at 74 (2d Cir. 1982); *U. S. v. Pacella,* 622 F.2d 640, 643 (2d Cir. 1980); *United States v. Morales,* 566 F.2d 402, 406–08 (2d Cir. 1977); *In the Matter of Persico,* 491 F.2d 1156, 1160–62 (2d Cir.), *cert. denied,* 419 U.S. 924, 95 S.Ct. 199, 42 L.Ed.2d 158 (1974). *See also Gelbard v. United States,* 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972).

II. *Fifth Amendment Privilege: Foreign Prosecutions.*

Mr. Flanagan's second objection is not so easily resolved. Although the immunity order fully protects him from the use of his grand jury testimony in any subsequent state or federal prosecution (*See Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964)), Mr. Flanagan vigorously professes his fear of prosecution in Great Britain, Northern Ireland or the Republic of Ireland where the United States Government obviously can give Flanagan no immunity. Without such assurance, Mr. Flanagan argues that he cannot—consistently with the Fifth Amendment—be compelled to testify.

The question whether a grand jury witness who has been given domestic use immunity may invoke the privilege against self-incrimination when he fears that his testimony may be used against him in a foreign prosecution has been expressly left open by both the Supreme Court and the Second Circuit. *Zicarelli v. New Jersey State Commission of Investigation*, 406 U.S. 472, 480–81, 92 S.Ct. 1670, 1676–77, 32 L.Ed.2d 234 (1972); *United States v. Yanagita*, 552 F.2d 940, 946 (2d Cir. 1977). In *Zicarelli*, the issue was avoided when the Supreme Court concluded that the questions put to the witness would not incriminate him under foreign law. *Id.* In *Yanagita*, the Second Circuit refused to decide the question because the witness had not shown that the fear of foreign prosecution was real and substantial. *United States v. Yanagita*, 552 F.2d at 946.

1. *Reasonable Fear of Foreign Prosecution.*

To demonstrate that his fear of foreign prosecution is real and substantial, Mr. Flanagan must establish that the questions implicate foreign crimes, and that his answers would furnish a link in a chain of evidence that would lead to his incrimination under the foreign laws. The Court, therefore, has reviewed the foreign laws under which the witness could be prosecuted and then has analyzed the questions propounded by the Government to determine whether Flanagan does, in fact, have a reasonable fear of foreign prosecution.

A survey of the criminal statutes recently enacted in Northern Ireland and in the Republic of Ireland reveals a comprehensive effort to control the violence associated with the political struggle taking place in Ireland today. *See* Northern Ireland (Emergency Provisions) Act of 1978, C.53; The Criminal Jurisdiction Act of 1975, C.59; The Offences Against the State (Amendment) Act, 1972, No. 26; Bishop, *Law in the Control of Terrorism and Insurrection: The British Laboratory Experience*, 42 Law and Contemp. Prob. 141 (1978) (hereinafter cited as *Terrorism and Insurrection* ). As part of these emergency enactments, the Governments of Northern Ireland and the Republic of Ireland have outlawed several organizations which they have branded as terrorist organizations. Included on these lists of proscribed organizations is the Irish Republican Army. *See* Northern Ireland (Emergency Provisions) Act of 1978, Schedule 2; The Offences Against the State Act, 1939, No. 13; T. Coogan, *The IRA* 173 (1980).

The recent Northern Ireland and Republic of Ireland statutes were enacted to make it easier to convict a member of a proscribed organization. *See Terrorism and Insurrection, supra* at 169–170; M. Robinson, *The Special Criminal Court* 28 (1974). For example, under section 21(6) of the Northern Ireland statute, "the possession by a person of a document (a) addressed to him as a member of a proscribed organization; or (b) relating or purporting to relate to the affairs of a proscribed organization; or (c) emanating or purporting to emanate from a proscribed organization or officers of a proscribed organization, shall be evidence of that person belonging to the organization at the time when he had the document in his possession."

Section 21 of the 1939 Republic of Ireland statute has a similar provision. The 1972 amendments to the Republic of Ireland statute go even further. Thus, under section 3 of the 1972 Amendments to the Offences Against the State Act, any statement or conduct (including failing to deny

membership in a proscribed organization) by the accused person implying or leading to a reasonable inference that he is a member is evidence of membership. Moreover, a statement by an officer, above a certain rank, that he believes that the accused person is a member of a proscribed organization is also considered evidence of such membership. Offences Against the State (Amendment) Act, 1972 section 3(2).

There is no question that these countries enforce their laws. Between March, 1973 and November, 1974, for example, there were 28 prosecutions (22 convictions) in Northern Ireland for being a member of a proscribed organization. The statistics for this period, however, are somewhat understated, and the number of prosecutions would doubtless have been even greater had not the Government of Northern Ireland prosecuted alleged members on more serious charges. *See Terrorism and Insurrection, supra* at 169 n. 135, citing Report of a Committee to Consider, in the Context of Civil Liberties and Human Rights, Measures to Deal with Terrorism in Northern Ireland, CMND, No. 5847, App. B. (Lord Gardiner, Chairman 1975).

As for the Republic of Ireland, 192 individuals were convicted of being members of a proscribed organization between June, 1972 and December, 1979. There were 89 cases in which an individual was convicted of membership and other more serious crimes. Most of these convictions were for being members of the I.R.A. *See* The Special Criminal Court, *supra* at 28–35. It is not without significance that another individual who is said to be an unindicted co-conspirator in the alleged gun-running scheme to which this grand jury proceeding pertains was convicted in the Republic of Ireland in November, 1974, for being a member of the I.R.A.

■ It is clear, therefore, that the grand jury questions put to Mr. Flanagan will entangle him deeply in the penal laws of both Northern Ireland and the Republic of Ireland. Were he at risk of prosecution in this country, his Fifth Amendment privilege could be invoked because the answers to the questions propounded in the grand jury proceeding "would furnish a link in the chain" of evidence needed to support a conviction. *Blau v. United States*, 340 U.S. 159, 161, 71 S.Ct. 223, 224, 95 L.Ed. 170 (1950). It is not required that the grand jury testimony, in and of itself, be sufficient to support a conviction. *Id.* No reason is apparent why a different standard should be applied when the risk is of foreign prosecution.

Accordingly, the Court must consider all the circumstances surrounding the questions, including the setting in which they are asked, to determine whether the answers may have a tendency to incriminate the witness. *Hoffman v. United States*, 341 U.S. 479, 486–88, 71 S.Ct. 814, 818–19, 95 L.Ed. 1118 (1951). Assuming the Fifth Amendment applies to foreign prosecutions, it may be invoked if the answers to the questions might provide a link in the chain leading to the witness' incrimination in a foreign jurisdiction. *Hoffman v. United States*, 341 U.S. at 486–88, 71 S.Ct. at 818–19; *Blau v. United States*, 340 U.S. at 161, 71 S.Ct. at 224; *In re Cardassi*, 351 F.Supp. 1080, 1083 (D.C.Con.1972); Note, *Testimony Incriminating Under the Laws of a Foreign Country—Is There a Right to Remain Silent?*, 11 N.Y.U. J. Int'l L. & Pol. 359, 371–75 (1978).

The answers to the questions concerning whether Flanagan knew six men who are alleged to have shipped guns to the IRA in Great Britain and Ireland may indeed provide a link in the chain of evidence needed to support his conviction for being a member of the IRA. It is a fair inference that the six men in question are involved in the affairs of the IRA, an inference all the more compelling when it is noted that, under FISA, electronic surveillance of the type directed at some or all of these six men may be used only when the United States seeks information about a "foreign power" or an "agent of a foreign power." 50 U.S.C. § 1804(a)(4)(A). A foreign power includes "a group engaged in international terrorism or activities in preparation therefor." 50 U.S.C. § 1801(a)(4).

Furthermore, the answer to the other question propounded by the Government ("Have you ever engaged in any activities with any of the aforementioned six men in transporting arms or ammunition in the Eastern District of New York, which includes Brooklyn, Queens, Staten Island, Nassau and Suffolk Counties?") would also provide such a link. If the witness has a reasonable fear of being prosecuted for being a member of the IRA, which the Court thinks he does, then an admission that he was involved in the transportation of guns which allegedly were ultimately to be delivered to the IRA in Ireland certainly forges a connection with the IRA.[7]

Although there is no allegation of a pending prosecution of Mr. Flanagan in these countries, as Judge Newman stated in *Cardassi*, "*Zicarelli* does not appear to require any indication that a foreign prosecution is imminent." *In re Cardassi*, 351 F.Supp. at 1085. A review of FISA and its legislative history significantly advances Flanagan's contention that his fear of foreign prosecution is real and substantial. Section 106 of FISA permits the disclosure of foreign intelligence information gained by electronic surveillance if the disclosure is for lawful purposes. Indeed, the legislative history suggests that Congress intended that foreign intelligence information be disseminated to cooperating intelligence services of other nations, as long as this dissemination "is in the interest of the United States." See S.Rep.No.95–604, *supra* at 54, U.S.Code Cong. & Admin.News (1978) p. 3955.

I am not unmindful that the shroud of secrecy imposed upon grand jury proceedings by Rule 6(e) of the Federal Rules of Criminal Procedure has persuaded several

courts that there is no real risk of foreign use of grand jury testimony and that, accordingly, the Fifth Amendment may not be invoked in these cases. *See In re Postal Grand Jury Proceedings*, 559 F.2d 234 (5th Cir. 1977); *In re Tierney*, 465 F.2d 806 (5th Cir. 1972); *In re Parker*, 411 F.2d 1067 (10th Cir. 1969), vacated and remanded as being moot, *Parker v. United States*, 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970); *United States v. Weir*, 495 F.2d 879 (9th Cir. 1974).

With all deference, I am not persuaded by these authorities. A careful reading of Rule 6(e) indicates that a district court judge does not have the control over disclosure of grand jury testimony that was assumed in these cases. The first three cases cited state that Rule 6(e) requires a court order to permit disclosure of matters occurring before a grand jury. As amended in 1977, however, Rule 6(e) now permits disclosure without a court order to an attorney for the government for use in the performance of his duty and to government personnel deemed necessary to assist the government attorney in the performance of his duty to enforce federal criminal law. Rule 6(e)(3)(A)(i), (ii); *In re Federal Grand Jury Witness Lemieux*, 597 F.2d 1166, 1168–69 (9th Cir. 1979) (Hufstedler, concurring); *In re Grand Jury Miscellaneous No. 979*, 583 F.2d 128, 130 (5th Cir. 1978); Moore's Federal Practice, ¶ 6.06[3] at 6–155; Notes of the Advisory Committee on Rules, 18 U.S.C. Rule 6, App. at 44–45; Notes of the Committee on the Judiciary, S.Rep.No.95–354, 95th Cong., 1st Sess. 5–8 (1977); *reprinted in* [1977] U.S.Code Cong. & Ad.News, 527, 529–32.

---

7. I have not overlooked *United States v. Doe*, 361 F.Supp. 226, 227 (E.D.Pa.1973), where it was held that no reasonable fear of foreign prosecution on smuggling charges was established because the questions concerning the smuggling of guns were limited to activities within the United States. This conclusion completely ignores the Irish statutes, already discussed, which deal with membership in proscribed organizations. Although Flanagan may or may not face prosecution for the possession and smuggling of arms because these activities

occurred outside the jurisdiction of the Irish courts, knowledge of these activities could certainly provide evidence to be used to connect Flanagan with the IRA. Thus, the witness could not control the potential incriminating effect of an affirmative answer by confining his response to activities that occurred in the United States, as suggested in *Zicarelli*. This Court, therefore, finds that any answer would provide a link to an organization whose existence is proscribed in both Northern Ireland and the Republic of Ireland.

■ Although unauthorized disclosure of grand jury testimony is punishable by contempt, such *post hoc* penalties provide little protection for the witness. *In re Cardassi*, 351 F.Supp. at 1082; Note, *Testimony Incriminating Under the Laws of a Foreign Country—Is There a Right to Remain Silent?*, 11 N.Y.U. J. Int'l L. & Pol. 359, 382 (1978). Reliance on the assumption that government officials will always maintain the secrecy of grand jury testimony is both "unacceptably disingenuous" (*In re Lemieux*, 597 F.2d at 1168–69), and insufficient to prevent the invocation of the privilege against self-incrimination. *In re Cardassi*, 351 F.Supp. at 1081.

■ Additionally, although the witness probably could not be extradited to Northern Ireland for alleged membership in a proscribed organization,[8] the Government has given no assurance that the witness will not be extradited for other crimes that may come to light as a result of its investigation into the alleged smuggling conspiracy. Moreover, assurances that extradition is unlikely are insufficient to protect a witness. *In re Grand Jury Witness Lemieux*, 597 F.2d at 1169. More importantly, the witness claims that he is a citizen of the Republic of Ireland and has indicated that he travels to Ireland once a year. Refusal to extradite would be little solace to one who might wish to travel to his native country. *In re Tierney*, 465 F.2d 806, 812 (5th Cir. 1972); *In re Lemieux*, 597 F.2d at 1169. *See also, Zemel v. Rusk*, 381 U.S. 1, 13–16, 85 S.Ct. 1271, 1279–1280, 14 L.Ed.2d 179 (1964); *Aptheker v. Secretary of State*, 378 U.S. 500, 505–14, 84 S.Ct. 1659, 1663–67, 12 L.Ed.2d 992 (1964); *Kent v. Dulles*, 357 U.S. 116, 125–26, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958).

2. *Privilege Against Self-Incrimination Applies to Foreign Prosecutions.*

■ Having found that Flanagan's fear of foreign prosecution is reasonable, this Court must finally decide whether the Fifth Amendment protection against self-incrimination extends to a risk of foreign prosecution. I hold that it does.

In *Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), the Supreme Court overturned the rule that allowed a state to compel a witness to give testimony even though that testimony could later be used to convict the witness of a crime in the federal courts. The Court held that a state witness could be compelled to give testimony that might be incriminating under federal law only if federal officials were thereafter prevented from using such testimony and its fruits in a federal criminal prosecution. Moreover, if a prosecution based on federal charges is subsequently instituted, the federal authorities must establish that their evidence is based on a legitimate source, wholly independent of the testimony given under the grant of immunity. *Murphy*, 378 U.S. at 79, 84 S.Ct. at 1609. It is noteworthy that in reaching this result the Court relied on the construction and scope given to the privilege by the English Courts, which recognize the privilege when there is a risk of foreign prosecution. *Id.* at 62–63, 84 S.Ct. at 1600–1601, citing *United States of America v. McRae*, L.R., 3 Ch.App. 79 (1867). *See In re Cardassi*, 351 F.Supp. 1080, 1084–85.

Eight years later the Court was asked to decide whether the grant of *use* immunity (where there may be a subsequent prosecution if evidence independent of the testimony given under immunity is the sole basis of the prosecution) rather than *transactional* immunity (where subsequent prosecution is totally forbidden) was sufficient to supplant the witness' right against self-incrimination. In *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court held that use immunity sufficed for this purpose, primarily because *Murphy* had already imposed upon the prosecution in the second jurisdiction the bur-

8. The extradition treaty between the United Kingdom of Great Britain and Northern Ireland and the United States allows extradition only if the offense is punishable under the laws of both jurisdictions. Article III(1)(a). *See United States v. Mackin*, 668 F.2d 122 (1981) (no extradition for a political crime).

den of establishing that its evidence was not derived from the testimony given by the witness under immunity in the first jurisdiction.[9]

Under our law the prophylactic effect of this burden is preserved by dismissing the indictment in the second jurisdiction when the burden is not satisfied. *See U. S. v. Nemes*, 555 F.2d 51, 56–7 (2d Cir. 1977); *In re Cardassi*, 351 F.Supp. at 1082; Note, *Federal Witness Immunity Problems and Practices under 18 U.S.C. § 6002–6003,* 14 Am.Crim.L.Rev. 275, 284 (1976–77). Foreign prosecutors, however, will not have to satisfy the heavy burden of establishing that Mr. Flanagan's prosecution is based on evidence wholly independent of his compelled testimony. Without that assurance, the immunity offered to Mr. Flanagan by the Government is not sufficient to supplant the protections guaranteed to him by the Fifth Amendment. *See In re Cardassi*, 351 F.Supp. at 1982–85; Comment, *The Federal Use Immunity Statute Since Kastigar*, 1974 New York University School of Law Annual Survey of American Law, 343, 349–356 (1974).

## CONCLUSION

In light of these findings, the Court holds that the witness may invoke his Fifth Amendment privilege against self-incrimination and may refuse to testify, despite the grant of immunity under 18 U.S.C. §§ 6002, 6003. Accordingly, the Government's motion to compel the witness' testimony under 28 U.S.C. § 1826(a) is denied.

SO ORDERED.

9. The Second Circuit in *U. S. v. Nemes*, 555 F.2d 51 (2d Cir. 1977) has indicated that the burden is indeed heavy. In this case, the Second Circuit held that the burden was not satisfied by a prosecutor's assurance that he had not used the compelled testimony. Inasmuch as there was a "possibility that someone who has seen the compelled testimony was thereby led to evidence that was furnished to federal authorities" the Court held the prosecutor's assurances that he did not use the compelled testimony could not be relied upon to afford the witness the full protection the Constitution guarantees. *Nemes, supra* at 55. Compare the lighter burden placed upon the Government when a claim is made that grand jury questions are based on evidence gathered with the aid of illegal electronic surveillance. *See* discussion in text, *supra* at p. 961.