UNITED STATES of America, Appellant,

v.

Michael Kazuo YANAGITA and Marc
Choyei Kondo, Appellees.

No. 670, Docket 76–1405.

United States Court of Appeals,
Second Circuit.

Argued Jan. 11, 1977.

Decided March 30, 1977.

Edward R. Korman, Chief Asst., U. S. Atty., Brooklyn, N.Y. (David G. Trager, U. S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellant.

James Reif, Brooklyn, N.Y. (Amy Gladstein, Attorney, Gladstein, Meyer & Reif, Brooklyn, N.Y., of counsel), for appellees.

Before KAUFMAN, Chief Judge, MANSFIELD and VAN GRAAFEILAND, Circuit Judges.

MANSFIELD, Circuit Judge:

This appeal concerns the timeliness of claims by witnesses under 18 U.S.C. § 3504[1] that their examination was to be based upon the products of unlawful surveillance and the scope of the government's duty under that statute to "affirm or deny" the existence of illegal wiretapping in response to requests first made on the day the witnesses were required by subpoena to appear and testify in a criminal trial. We hold that under the circumstances of this case their requests were untimely and that in any event the affidavit of an Assistant United States Attorney based on his own knowledge and on representations by the chief investigative unit involved in the case and a statement by the Assistant United States Attorney conducting the examination were sufficient to satisfy § 3504. Accordingly, we reverse the dismissal of the contempt informations filed against the witnesses.

This controversy arose when appellees Michael Yanagita and Marc Kondo were subpoenaed by the government to testify at the trial of Kenneth Chin and Elizabeth Young, who were charged with a series of federal firearms violations after the government seized a cache of weapons at their apartment in October, 1975. One of the weapons, a rifle, was traced to a firearms dealer in California, whose records showed that it had been purchased by Kondo. Documents filed at the New York City Firearms Control Board indicated that two other seized weapons were purchased by Kenneth Chin from Yanagita. The government sought appellees' testimony in order to establish the means by which these weapons were transferred to Chin and Young.

Yanagita was first subpoenaed to testify at the April, 1976, trial of Young. He appeared but refused to take the witness stand, invoking his privilege against self-incrimination. He asserted the possibility of a criminal prosecution against him by Japan, since one theory of the government's case was that Chin and Young had plotted the assassination of the Emperor of Japan who was visiting the United States at the time the weapons were seized. Pursuant to a stipulation, an out-of-court statement was

1. Section 3504 provides in pertinent part:
"(a) In any trial, hearing, or other proceeding in or before any court . . . or other authority of the United States—
"(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act, or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny· the occurrence of the alleged unlawful act;

\* \* \* \* \* \*

"(b) As used in this section 'unlawful act' means any act, the use of any electronic, mechanical or other device (as defined in section 2510(5) of this title) in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto."

admitted at the trial in lieu of Yanagita's testimony. However, he was subpoenaed to appear at the June 21, 1976, trial of a superseding indictment filed against Chin and Young after the earlier trial of Young ended in her acquittal on one count and a mistrial on the other.

Appellee Kondo was subpoenaed on May 18, 1976, to testify on June 21. His counsel arranged with the government for Kondo to be flown to New York from California on Thursday night, June 17. On Friday, June 18, Kondo met with his attorney and disclosed facts which led his attorney to file on Kondo's behalf a motion pursuant to § 3504 on the opening day of trial. In an affidavit, Kondo alleged difficulties with his telephone service during the summer of 1975 and claimed that he had seen, in November 1975, certain information in a government file which could have come only from a telephone conversation he had had with Elizabeth Young. Kondo's attorney then met with Yanagita, also his client, on June 20, 1976, and a similar motion was filed on his behalf on June 21. Yanagita's affidavit similarly alleged continuing telephone difficulties and that at least one of the telephone conversations during the period of difficulty was "relevant" to the indictment against Chin and Young.

On June 21 counsel for Yanagita and Kondo appeared before the trial judge, Chief Judge Jacob Mishler, and requested that the government determine whether illegal surveillance had been used against Yanagita and Kondo. Judge Mishler initially found the request untimely and made in bad faith and ordered the defendants to testify.

When the trial began, Yanagita was called by the government and refused to testify, asserting his Fifth Amendment privilege. In response, the government immediately granted him immunity under 18 U.S.C. §§ 6002 and 6003, and the court ruled that his fear of Japanese prosecution was insufficient to support his refusal to testify. When Yanagita renewed his surveillance request and continued to refuse to testify, Judge Mishler suspended the trial for several hours in order to allow the government to reply. When court resumed that afternoon, the government stated that an "all-agency" surveillance check would take a minimum of several weeks time and disrupt the trial, but it offered an affidavit to the effect that the principal agency involved in the investigation of the firearms violations, the Bureau of Alcohol, Tobacco and Firearms, had been contacted orally and had denied the existence of any wiretapping of the telephones of either Yanagita or Kondo. In addition, the Assistant United States Attorney in charge of the case swore that he had no knowledge of any illegal surveillance in the investigation.

Yanagita and Kondo refused to accept the affidavit based upon oral representations and requested written agency checks from ATF as well as from the FBI and the Secret Service, which also had been involved in some parts of the investigation. Judge Mishler ruled that the government's responses were sufficient under the circumstances and refused to further delay the trial. When Yanagita and Kondo were called to testify, each declined to do so. They were held in contempt of the district court and when each refused the opportunity to purge himself the following day, they were jailed for the duration of the trial, but not in excess of 30 days. Two days later the jury returned a guilty verdict against Chin and Young on two counts of their indictment, but acquitted them on four counts regarding the acquisition of weapons from Yanagita and Kondo.

On June 24, 1976, appellees were charged with criminal contempt under 18 U.S.C. § 401 for refusing to obey the court's order to testify, and the case was assigned to Judge John F. Dooling, Jr. On August 17, 1976, Judge Dooling, in a written opinion reported at 418 F.Supp. 214, denied appellees' Fifth Amendment claims but dismissed the contempt informations against them on the ground that the orders to testify were based upon insufficient assurances by the government that illicit surveillance had not been employed. The government took this appeal from Judge Dooling's order.

## DISCUSSION

In *Gelbard v. United States,* 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), the Supreme Court held that as a defense to a contempt charge a grand jury witness may assert that his testimony would have been inadmissible in the original proceeding under 18 U.S.C. § 2515, which provides that:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding . . . ."

In addition, *Gelbard* held that pursuant to 18 U.S.C. § 3504 the witness could, as a "party aggrieved," require the government to "affirm or deny" the occurrence of illegal interceptions upon his claim that the government's questions would be based on information derived from illegal surveillance. Although the claim need not be particularized, see *United States v. Toscanino,* 500 F.2d 267 (2d Cir. 1974), it may not be based upon mere suspicion but must at least appear to have a "colorable" basis before it may function to trigger the government's obligation to respond under § 3504. *In re Millow,* 529 F.2d 770 (2d Cir. 1976). In *United States v. Huss,* 482 F.2d 38, 44 (2d Cir. 1973), we extended the applicability of *Gelbard* to give a trial witness standing to invoke § 3504 upon his claim of illegal surveillance.

Like other objections, the public interest in avoiding delay and disruption of criminal trials, see *United States v. Mauro,* 507 F.2d 802, 806–07 (2d Cir. 1974); *United States v. Sisca,* 503 F.2d 1337, 1346–49 (2d Cir. 1974), requires that a claim under § 3504 be asserted promptly upon the witness' having a reasonable basis for doing so and may be waived by his failure to avail himself of an opportunity to make such a timely assertion after he has gained knowledge of facts providing a reasonable basis for the claim or by his testifying with knowledge of such facts. On the other hand, where a timely claim is asserted and the government's response is inadequate to determine the existence of illegality but the witness nonetheless is required to testify and is then held in contempt for refusing to do so, the contempt charges must be vacated. See *Gelbard v. United States, supra; In re Quinn,* 525 F.2d 222 (1st Cir. 1975).

In the present case Yanagita and Kondo contend that the government's response to their § 3504 request was inadequate and for that reason they may not be held in contempt. The government, in turn, replies that appellees' motions were untimely and that under the circumstances the government's response was sufficient. We agree with the government.

Neither the timeliness of a claim asserted under § 3504 nor the legal sufficiency of the government's response to a request can be measured by any precise or fixed yardstick. Timeliness depends upon a number of important factors, including the type of proceeding involved, the stage of the proceeding, the opportunity to raise the issue at prior stages or in different proceedings, the scope of the government's intended examination of the witness, the period of time between the service of the subpoena or other notice of testimony and the § 3504 request, the time required for a full and complete agency check, and the extent of the disruption that will be caused by the witness' claims. A prudent balancing of these factors is necessary to protect both the public interest in preventing undue delay in trials and other judicial proceedings as well as the rights of individuals to be free from illegal invasions of privacy. Even though, after reviewing and balancing these factors, a request is found to be not untimely, it may still be so broad or come so late under all the circumstances that a response which might otherwise be insufficient will be deemed acceptable. Nothing in § 3504 decrees that the affirmance or denial be furnished by a specific time, much less that it always be in writing.

During a continuing grand jury proceeding, the usual setting for claims under § 3504, time is usually not as much of the essence as during a trial because the grand jury sits for a much longer period of time than the average trial jury and thus may

recall a witness after his § 3504 request has been answered. Under these circumstances, a § 3504 request will rarely be rejected as untimely, and the government has been held to a high standard of completeness in responding to such a request. *In re Buscaglia*, 518 F.2d 77, 79 (2d Cir. 1975). But even in a grand jury proceeding, upon the government's production of a valid warrant the witness has been held not to be entitled to a full-blown hearing on the legality of the warrant prior to testifying since "the traditional notion that the functioning of the grand jury system should not be impeded or interrupted could prevail at that time over the witness' interest . . . ." *In re Persico*, 491 F.2d 1156, 1160 (2d Cir. 1974). See also *Gelbard v. United States, supra*, 408 U.S. at 70, 92 S.Ct. 2357 (White, J., concurring).

■ Similarly, where the questions asked of a grand jury witness are narrow in scope, an affidavit by the Assistant United States Attorney in charge of the grand jury proceeding, as distinguished from an all-agency search, will suffice, since he would know if his questions were derived from illegal surveillance.

> "It must be remembered that any electronic surveillance by the government is relevant only if it is somehow used in formulating questions that the grand jury intends to ask. Thus, surveillance conducted by the government, the results of which were not known to the agents investigating this case, would not be relevant. . . . I think that the assistant United States attorney handling a case and the FBI agent in charge of the investigation of a case are the two people most likely to know if the fruits of any electronic surveillance were used to gain information on which the grand jury would base its questions. Thus, I think that the denial was sufficient." *United States v. Grusse*, 515 F.2d 157, 159 (2d Cir. 1975) (Lumbard, J., concurring).

In addition, the duty of the government to respond under § 3504 may vary with the specificity of the claims raised by the witness. *United States v. See*, 505 F.2d 845, 856 (9th Cir. 1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975); *United States v. Stevens*, 510 F.2d 1101 (5th Cir. 1975).

■ In the present case, the balance weighs decidedly in the government's favor. A motion made by trial witnesses only minutes before the commencement of a multi-count, multi-defendant trial, even when made in good faith—and here the trial judge found bad faith—must be viewed in light of the public's interest in preventing undue delay in bringing defendants to trial, as well as in light of the practical, but nonetheless critically important, public concern for the district court's caseload and calendar congestion, the expense and inconvenience of assembling witnesses and veniremen in a single location at a specified time, as well as the preparation efforts of the prosecution and defense attorneys. Most of these factors are absent in the context of grand jury inquiries. As the Supreme Court has stated in distinguishing the availability of summary contempt in grand jury proceedings and at trial:

> "A grand jury ordinarily deals with many inquiries and cases at one time, and it can rather easily suspend action on any one, and turn to another . . . . Trial courts, on the contrary, cannot be expected to dart from case to case on their calendars anytime a witness who has been granted immunity decides not to answer questions. In a trial, the court, the parties, witnesses and jurors are assembled in the expectation that it will proceed as scheduled." *United States v. Wilson*, 421 U.S. 309, 318, 95 S.Ct. 1802, 1807, 44 L.Ed.2d 186 (1975).

Here the circumstances leading appellees to suspect that their telephone wires were tapped occurred as early as the summer of 1975, and appellees knew long prior to the commencement of the trial of Chin and Young on June 21, 1976, that they would be subpoenaed to testify regarding subject matter claimed by appellees to be relevant to some of the telephone conversations they suspected to have been wiretapped. Yanagita had given a signed statement regard-

ing the case in the fall of 1975 to John Carenco, an agent of the Bureau of Alcohol, Tobacco and Firearms, which was shortly thereafter shown by Carenco to Kondo when he was interrogated by the same agent. Indeed Kondo, in his later motion under § 3504, claimed that a government file, seen by him in November, 1975, contained information which could only have been derived from illegal surveillance of his telephone. In April, 1976, Yanagita, represented by his present legal counsel, refused on Fifth Amendment grounds to testify at the first trial of Young without asserting any surveillance claim, and was at that time ordered by the court to appear to testify at the second trial on June 21, 1976, an order later reaffirmed by the service upon him of a subpoena ad testificandum. On May 10, 1976, the government sent to Kondo's legal counsel, who also represented Yanagita, a copy of a subpoena to be served on Kondo to testify at the June 21st trial, which was served on the witness on May 18, 1976. No reason is shown why Yanagita and Kondo, knowing all of the relevant information later forming the basis of their claim and given adequate notice of their required appearances, could not have made their motion a substantial time prior to the morning of the trial, which would have given the government sufficient time to make the type of surveillance check later demanded by their counsel. Instead, they made their demand only when it was too late to furnish such a response without seriously disrupting the proceedings.

Under these circumstances, we hold that appellees' claim under § 3504 should have been asserted at an earlier point in time and their failure to assert it until the morning of trial rendered it untimely. Furthermore, after balancing all of the relevant factors, we find the government's response to appellees' § 3504 request to have been adequate under the circumstances.

Despite his initial findings that the § 3504 motion had been made in bad faith and was untimely, Chief Judge Mishler delayed taking any immediate action when appellees refused to testify. Following the delay, the government submitted a statement by the Assistant United States Attorney in charge of the trial and an affidavit by his superior in the United States Attorney's office to the effect that an oral check had been made with the Bureau of Alcohol, Tobacco and Firearms, that it reported that no surveillance by it of appellees' telephones had occurred, and that the ATF agent in charge of the investigation had no knowledge of any surveillance. The Assistant United States Attorney conducting the trial denied using any surveillance materials in formulating his questions for appellees. Any effort on the part of the government to obtain further immediate oral reports from other agencies for incorporation in affidavits by the United States Attorney's office was foreclosed when appellees' counsel advised that they would be content with nothing short of affidavits from the agencies themselves, which would take several weeks.

As in *United States v. Grusse*, 515 F.2d 157, 159 (2d Cir. 1975), we are satisfied that under these circumstances the government did all that could reasonably be expected of it and that its denial was sufficient to satisfy the requirements of § 3504. To hold otherwise would be to put every criminal jury trial at the mercy of any key witness bent on sabotaging it. In conducting such a trial the court is dealing with an orchestrated event in which the simultaneous participation of many persons—judge, counsel, defendants, witnesses and jurors—is essential. The necessity for their coordinated presence renders it a fragile procedure at best, which can be destroyed or subjected to horrendously wasteful delay because of non-participation on the part of any of the essential figures. See *Nardone v. United States*, 308 U.S. 338, 341–42, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Disruption through contrived maneuvering under the guise of § 3504 or even a casual attitude on the part of witnesses or their counsel is to be discouraged. We therefore reverse that part of the district court's decision holding the government's response inadequate.

Appellees also claim that despite the grant of use immunity for their testimony, they could not be protected from the threat of foreign prosecution and that their refusal to testify at trial was therefore within their Fifth Amendment privilege against self-incrimination. The district court rejected this claim as "too chimerical." We agree. Guided by the Supreme Court's decision in *Zicarelli v. N.J. Investigation Commission*, 406 U.S. 472, 478, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972), we find it unnecessary to reach the constitutional question of whether the Fifth Amendment privilege applies to threats of foreign prosecution[2] in the absence of showing a basis for "a real and substantial fear" of such prosecution. Appellees' claim is simply too "remote" and "speculative" to qualify.

■ Where inquiry at trial or in a grand jury proceeding focuses upon activities engaged in by American citizens upon American soil, as it does in the case at bar, *Zicarelli* makes it clear that one invoking the Fifth Amendment privilege has the burden of establishing, first, that the subject of the government's questions raises "a real danger of being compelled to disclose information that might incriminate him under foreign law," and second, that there is a "real and substantial" fear that prosecution by the foreign government might ensue. Only after the witness meets this burden is the government required to show that the foreign government respects the grant of immunity conferred on the witness in order to compel him to testify. See *Murphy v. Waterfront Commission*, 378 U.S. 52, 79, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

In the present case, all of the activities of Chin, Young and the appellees took place on American soil. Nevertheless, because the theory of the government's case was that Chin and Young had conspired to assassinate the Emperor of Japan on his United States visit, Yanagita and Kondo claim that they risk Japanese prosecution. They rely principally on vaguely worded Japanese Penal Code provisions which define "an insurrectionary or seditious act with the object of overthrowing the government . . . or otherwise subverting the national constitution" as a capital offense, and provide a seven-year term of imprisonment for "A person who aids and assists the commission" of those crimes or attempts to commit those crimes "by furnishing arms." The Code applies to every person who commits the offenses "outside the territory of Japan."[3] Appellees, however, can point to no case in which this act has been interpreted as applying to attempts against the life of the Emperor, who is primarily a ceremonial figure under Japanese law. Nor do they cite any case in which a foreign citizen has been extradited to Japan under these provisions.

Even assuming the applicability of these statutes, appellees' claim falls short in two critical respects. First, there is no indication on the record that any question which

---

**2.** The application of the Fifth Amendment privilege to protect against disclosure of evidence relevant to offenses under the law of a foreign country has not been squarely decided by the Supreme Court, and lower courts have arrived at opposite results. Compare *In re Parker*, 411 F.2d 1067, 1070, vacated as moot *sub nom. Parker v. United States*, 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970), and *In re Cardassi*, 351 F.Supp. 1080, 1085–86 (D.Con.1972).

**3.** Japanese Penal Code, Articles 2, 77–79. Appellees seek to further their claim by citing the extradition treaty between the United States and Japan, 24 Stat. 1015, as supplemented, 34 Stat. 2951, but the reference reinforces our view that appellee's danger of foreign prosecution is more speculative than real. First, Article I of the treaty only provides for extradition of individuals found within one country who are accused of having committed an offense *within* the jurisdiction of the other country. Article V provides for extradition only on such evidence "as according to the laws of the place where the fugitive or person so charged should be found" would justify his going to trial "if the crime had been there committed." Thus, evidence inadmissible in a domestic proceeding on the basis of privilege or immunity would not be held admissible for the purposes of justifying extradition. Article VII of the treaty states that neither party is bound to deliver up its own citizens, and that extradition of these persons is solely a matter of discretion. Finally, the only crime which might fit the present case is "Murder" or assault with intent to commit murder, which undoubtedly requires facts and evidence far from the information sought to be elicited from appellees on the witness stand.

was directed to Yanagita or Kondo required that they admit any knowledge of or participation in a conspiracy to overthrow Japan or to kill its Emperor. Nor is there any indication that they would be asked to furnish leads to such evidence. In fact, the government represented to the district court that its questions would be directed solely at the means by which the weapons in question had been transferred to Chin and Young, and the indictment against Chin and Young was itself solely restricted to firearms violations. While appellees might have argued that some specific question posed by the prosecutor would provide important leads from which evidence could have been obtained by Japanese authorities, their wholesale refusal to respond to any questions posed to them at the trial denied them this chance and was unjustified by the speculative nature of their claim. See *In re Parker*, 411 F.2d 1067, 1069, vacated as moot *sub nom. Parker v. United States*, 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970). Without such a record, their claims are entirely too speculative and remote.

Secondly, appellees have totally failed to demonstrate that the Japanese authorities have any interest whatsoever in their prosecution. While we might be willing to assume the interest of a foreign sovereign in prosecuting crimes by our citizens which occur on its soil, see, e.g., *In re Cardassi*, 351 F.Supp. 1080, 1084 (D.Conn.1972), or where the offense falls within a frequently-used and clearly defined prohibition enacted by the foreign sovereign, we cannot make that assumption where, as here, the interpretation and application of the foreign statute is solely a matter of conjecture. Under these circumstances the important interests served by obtaining appellees' testimony for the purposes of a criminal prosecution under a grant of use immunity far outweigh any protection that might be afforded under the Fifth Amendment. Appellees are therefore foreclosed from asserting their Fifth Amendment privilege as a defense to this contempt proceeding.

■ We also reject appellee Kondo's assertion that the grant of immunity given to him at trial was invalid on the grounds that it was granted by an "acting" Assistant Attorney General who was authorized to act in the absence of the Assistant Attorney General in charge of the Criminal Division, who had been designated to authorize grant of immunity by the Attorney General pursuant to 18 U.S.C. § 6003(b). Kondo claims that his refusal to testify at the trial was justified on the ground that the delegation under § 6003 was unlawful. This contention is meritless. The authorization in question was carried out pursuant to valid agency procedure, see 28 C.F.R. 0.175, 0.133, and there is no suggestion in the language, history or purposes of the immunity provisions that a more restrictive mode of delegation is required for the protection of witnesses. Unlike the situation in *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), where the restriction on delegation was designed to protect members of the public against unwarranted invasion of privacy, the requirements here were not intended to protect witnesses but to minimize overuse of immunity grants. Moreover, protection of the witness would undoubtedly preclude the government from claiming the invalidity of the authorization after the witness had waived his constitutional rights in reliance thereon, whereas an opposite result would require each witness to fully litigate the validity of the authorization before relying on it.

The judgment of the district court is therefore reversed and the case is remanded for further proceedings.