PHOENIX ASSURANCE COMPANY OF CANADA, Norwich Union Fire Society, Ltd., Royal Insurance Company of Canada, Sun Insurance Office, and Wawanesa Mutual Insurance Company, Plaintiffs and Appellees,

v.

Clayton E. RUNCK, Jr., Defendant and Appellant,

Herman Sobania and George Schulz, Defendants and Appellees.

PHOENIX ASSURANCE COMPANY OF CANADA, Norwich Union Fire Society, Ltd., Royal Insurance Company of Canada, Sun Insurance Office, and Wawanesa Mutual Insurance Company, Plaintiffs and Appellees,

v.

Clayton E. RUNCK, Jr., Defendant and Appellant,

Herman Sobania and George Schulz, Defendants and Appellants.

PHOENIX ASSURANCE COMPANY OF CANADA, Norwich Union Fire Society, Ltd., Royal Insurance Company of Canada, Sun Insurance Office, and Wawanesa Mutual Insurance Company, Plaintiffs and Appellees,

v.

Clayton E. RUNCK, Jr., Defendant and Appellant,

Herman Sobania and George Schulz, Defendants and Appellants.

Civ. Nos. 10065, 10069 and 10090.

Supreme Court of North Dakota.

March 22, 1982.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, for plaintiffs and appellees; argued by M. Daniel Vogel, Fargo.

Robert Vogel, Grand Forks, for defendant and appellant Clayton E. Runck, Jr.

Brian C. Southwell, Minneapolis, Minn., for defendants and appellants Herman Sobania and George Schulz.

SAND, Justice.

These are consolidated appeals by the defendants and appellants, Clayton E. Runck, Jr., Herman Sobania, and George Schulz, from a state district court's order granting plaintiffs' and appellees', Phoenix Assurance Company of Canada, Norwich Union Fire Society, Ltd., Royal Insurance Company of Canada, Sun Insurance Office, and Wawanesa Mutual Insurance Company, [hereinafter collectively referred to as Phoenix] motions directing the defendants to respond to certain discovery procedures initiated by Phoenix and from the state district court's order denying the defendants' motion for a protective order from some of Phoenix's discovery proceedings and allowing Phoenix the continued use of grand jury transcripts and material in their case.[1]

The orders stem from an action initiated by Phoenix alleging insurance fraud perpetrated by the defendants[2] upon Phoenix as

---

1. Both Runck and Schulz testified under a grant of immunity before a federal grand jury in Minnesota as to their involvement in certain fires, including a fire in Manitoba, Canada, on 18 December 1971. Sobania apparently did not testify and, so far as the record before us reflects, has not been granted immunity. The United States Attorney's office moved the United States district court for the District of Minnesota to release these grand jury transcripts to Phoenix's attorneys. See Rule 6(e), FRCrimP. The motion was granted on 30 November 1979 by Judge Donald Alsop.

2. The action was initially initiated against Schulz only. Schulz initially refused to answer any questions at a deposition on 12 March 1980 and an order was obtained compelling Schulz to answer questions concerning the fire in Starbuck, Manitoba. At Schulz' second deposition on 7 April 1980 he implicated Runck and Sobania in the fire at Starbuck, Manitoba, and Runck and Sobania were made defendants through an amended complaint dated 16 April 1980.

a result of a fire in Starbuck, Manitoba, in December of 1971. Phoenix' amended complaint alleged, in substance, that Runck, a North Dakota resident, purchased a building in Starbuck, Manitoba, Canada, and insured it and its contents for $130,000; that later Runck and Sobania, a resident of Minnesota, transported and stored certain agricultural equipment in the building located on the land in Starbuck, Manitoba; that Runck, Sobania, and Schulz, a resident of North Dakota, made plans to burn the building and on or about 18 December 1971, Schulz and Sobania traveled to Starbuck, Manitoba, started, or made arrangements to start, a fire that resulted in the building burning to the ground; that Runck filed a proof of loss and received $75,715.00 from Phoenix; that the activities of the defendants constituted fraud and resulted in unjust enrichment; and that, as a result, Phoenix was entitled to damages and restitution. Defendants answered with a general denial, and also asserted that the statute of limitations barred any such action.

Both sides subsequently initiated discovery proceedings. The defendants individually invoked the fifth amendment privilege, whereupon plaintiff moved for orders compelling responses and the defendants individually or collectively moved for protective orders. These and other motions and countermotions culminated in at least three different hearings before the state district court which ultimately issued the orders[3] granting plaintiffs' motions compel-

---

**3.** The two orders referred to are:

The order dated 15 July 1981 captioned "Denying Defendants Various Motions" denied the following motions:

"1. Motion for Postponement and for Protective Order made by defendant Runck dated 17 October 1980;

"2. Motion for Protective Order made by defendant Schulz dated 27 November 1980;

"3. Motion for Protective Order made by defendant Sobania dated 30 October 1980;

"4. Motion to Suppress made by defendant Runck dated 31 October 1980."

and ordered:

"2. That the previous orders of this Court regarding defendants Sobania and Schulz will remain in full force and effect;

"3. That the plaintiffs' attorneys will be allowed to proceed with discovery as outlined in the companion order of this Court;

"4. That the plaintiffs will be allowed to utilize the grand jury transcripts and grand jury material referred to in the order of Judge Donald D. Alsop of the United States District Court for Minnesota dated 30 November 1979, in the case at bar;

"5. That the defendant Runck has failed to show any 'real and appreciable danger of incrimination' as is more fully outlined in the Court's Memorandum Opinion;

"6. That the defendant Runck's Fifth Amendment privilege does not apply to testimony he gave before the federal grand jury in Minnesota referred to in Judge Alsop's order or to his activities involving the Starbuck property and fire, including his application for fire insurance and subsequent claim for insurance proceeds later received from the plaintiffs."

The order dated 15 July 1981 captioned "Granting Plaintiffs Various Motions" granted the following motions:

"1. Motion for Order Compelling Discovery from defendant Runck dated 15 October, 1980;

"2. Motion to Compel Discovery dated 1 July 1981."

and ordered:

"2. That the defendant Schulz shall have twenty (20) days from the date of the hearing on 13 July 1981, within which to serve and file interrogatory answers under oath;

"3. That the defendant Sobania shall have five (5) days from the date of the hearing on 13 July 1981, within which to respond to the plaintiffs' Request for Admissions and Second Set of Interrogatories;

"4. That the defendants Runck and Sobania shall have 20 days from the date of the hearing on 13 July 1981, within which to serve and file interrogatory answers under oath in accordance with this Court's order;

"5. That the defendant Runck shall respond to the plaintiffs' attorneys' deposition questions and interrogatories relating to his personal and business background, his general involvement in the used parts business, his general acquaintanceship with the co-defendants, his criminal record, his involvement as a party or as a witness in civil litigation, and his appearance before the United States Grand Jury referred to in the order of Judge Donald D. Alsop of the United States District Court for the District of Minnesota;

"6. That the defendant Runck shall respond to the plaintiffs' attorneys' deposition questions and interrogatories regarding his ownership or former ownership of real property in Starbuck, Manitoba, regarding his application for fire insurance, and regarding his receipt of fire insurance proceeds;

"7. That the defendant Runck shall further respond to questions regarding the fire which occurred at Starbuck, Manitoba, on or

ling discovery and denying defendants' motion to suppress the grand jury transcript and material.

The defendants separately appealed from these orders and the appeals were combined.[4]

Prior to reaching the merits of the defendants' appeal, we must discuss two preliminary matters.

■ Phoenix filed a motion to dismiss Schulz' appeal because no brief was filed on behalf of Schulz. During oral argument we were informed by counsel for Sobania, who also filed the notice of appeal for Schulz, that the brief filed on behalf of Sobania also applied to Schulz because the issues were identical as to each. However, the issues are not identical. Schulz was granted immunity in exchange for testifying before the grand jury and, so far as the record before us reflects, Sobania did not testify before the grand jury, nor was he given immunity. Nevertheless, because of other similarities we will consider Schulz' appeal and deny Phoenix' motion to dismiss.

■ The second preliminary matter which we must consider is whether or not the orders issued by the state district court are appealable. Although the question was not raised by the parties, it is a matter of jurisdiction and this Court may dismiss the appeal on our own motion if the orders are not appealable. *Simpler v. Lowrey*, 316 N.W.2d 330 (N.D.1982); *Chas. F. Ellis Agency, Inc. v. Berg*, 214 N.W.2d 507 (N.D. 1974).

During oral argument several theories were suggested upon which we could reach the merits of this appeal. These theories treated the orders as affecting substantial rights of the parties which if lost cannot be undone and that the orders involved the merits of the action.

■ Ordinarily, orders relative to discovery procedures are interlocutory and not appealable. *Northwest Airlines, Inc. v. State Board of Equalization*, 244 N.W.2d 708 (N.D.1976). Interlocutory orders may be appealable if they involve the merits of the action. Section 28–27–02(5), North Dakota Century Code; *Northwest Airlines, Inc. v. State Board of Equalization, supra.*

In *Northwest Airlines, Inc., supra* at 710 we said:

"The words 'merits of the action' cannot be clearly defined in any technical legal sense, however, they can be regarded as referring to significant legal rights as distinguished from technicalities relating to only procedure or form."

■ Although we recognize that discovery orders are not generally appealable, we believe the orders issued in this instance are appealable because they involve substantial constitutional rights which, if violated, may be so damaging as to cause irreparable harm. *Cf. Burlington Northern v. North Dakota District Court*, 264 N.W.2d 453 (N.D.1978) [petition to Supreme Court to exercise original jurisdiction].

The appeals raised two main issues: (1) Does the fifth amendment privilege against self-incrimination apply to possible foreign prosecution, and (2) What action should this Court take regarding the appeal from the district court's order denying the suppression of the grand jury transcript and material?

■ We will first consider the state district court's order denying the defendants' motion to suppress the use of the grand jury transcript and materials and the defendants' appeal of that order to this Court.

Earlier the federal district court of Minnesota upon the application of the United States Attorney had issued an ex parte order permitting the disclosure of the grand jury transcripts and material "preliminarily to and in connection with judicial proceed-

about 18 December 1971, including the events surrounding said fire."

4. Counsel for Schulz withdrew from the case through an order dated 31 July 1981. On 11 September 1981 counsel for Sobania filed a

notice of appeal for Schulz, but up until the time of oral argument no separate brief had been filed on behalf of Schulz. However, Sobania's brief indicated that it was filed by counsel for Sobania and Schulz.

ings, namely civil litigation to recover losses due to possible arson and insurance fraud."

This order, as indicated by its caption, was issued pursuant to the provisions of Rule 6(e)(3)(C)(i), Federal Rules of Criminal Procedure. See *In re Judge Elmo B. Hunter's Special Grand Jury Empaneled September 28, 1978* (30 Crim.L.Rep. 2331).

Thereafter the transcripts and grand jury material were made available to Phoenix.

The defendants' motion,[5] in the state district court, to suppress the use of the federal grand jury transcript and material, which use was authorized by an ex parte order issued by a federal district court in Minnesota, in a limited sense, is comparable to an appeal to a state district court seeking a reversal of a federal district court's order.

During oral argument we were advised that appropriate steps are being taken to make the ex parte order authorizing the disclosure of the grand jury material and transcript issued by the federal district court appealable, and then appeal it to the appropriate court.[6]

In a somewhat analogous situation in which this Court declined to assume original jurisdiction, Justice Strutz, in a concurring opinion in *State v. Meier*, 127 N.W.2d 665, 674 (N.D.1964), said:

> " . . . If our decision would be effective as a final judgment of this court, the reservation of the jurisdiction by the Federal District Court is entirely meaningless because that court has no appellate jurisdiction over the decisions of this court."

Conversely, we can add by saying that state courts do not have appellate jurisdiction over federal district courts. Even though the federal district court did not specifically retain jurisdiction as was the case in *State v. Meier, supra*, the federal district had and continues to have jurisdiction over the subject matter and on that basis a hearing on the ex parte order can be held making such order appealable and an appeal can be proc-

essed through the federal appellate channels. Unlike the *Meier* case, the federal court in this instance did not direct the matter to be brought to the state court. We believe the reference to a "court" in Rule 6, FRCrimP, is to a federal court, preferably the one in whose district the grand jury convened, rather than a state court. Even if appellate jurisdiction is not directly involved here, "we employ the doctrine of comity—the court that first acquires jurisdiction of the question retains it, which in this case, is the United States district court. [Citation omitted.]" *State v. Meier, supra* at 671. See also, *Medical Arts Building, Ltd. v. Eralp*, 290 N.W.2d 241 (N.D.1980), as to comity.

This suggests that in this instance a decision issued by a federal appellate court after reviewing the order of the federal district court, authorizing the use of the federal grand jury transcript and material, which came to the appellate court through the regular channel of appeals, would be given preference over a decision issued by a state court on a collateral matter, particularly on the issue whether or not the use of a federal grand jury transcript and material should be suppressed. As a result our opinion, in a sense, would only be advisory, which under our Constitution, is not permitted. Section 10, Article VI, N.D.Const.; *State v. Meier, supra*.

Furthermore, bifurcated procedures, including the equivalent of an appeal pertaining to the same subject matter, one in federal district court and one in state courts, can result in endless confusion and therefore are not encouraged. See, *Shark Brothers, Inc. v. Cass County*, 256 N.W.2d 701 (N.D.1977), regarding simultaneous proceedings before two governmental bodies of the state.

In addition, the material and evidence submitted and made available to the federal district court conceivably could be different

---

**5.** This is the motion which was denied on 15 July 1981 by order of Judge Backes, state district court.

**6.** We were informed by counsel that federal procedures exist which make an ex parte order appealable only after a hearing on the matter has been had and that the defendants were in the process of accomplishing this.

from the material and evidence that was submitted to the state district court as well as to this Court and could be the basis for different conclusions. This would not promote the ends of justice.

Finally, taking into account the time during which the grand jury material has been available and used, a true suppression regarding its use, as distinguished from treating it as evidence in a trial, would be almost as difficult as trying to "unring a bell."

On the basis of the foregoing, we abstain [7] from entertaining or considering that portion of the North Dakota district court order denying the motion to suppress the use of the federal court grand jury material referred to in the order of Judge Donald D. Alsop of the United States District Court of Minnesota, dated 30 November 1979.

■ In reaching this conclusion we nevertheless realize and conclude that the suppression of certain material such as a grand jury transcript declaring it inadmissible *evidence* at trial, as distinguished from its pretrial *use* is a different matter and depends upon the existing circumstances and subject matter under consideration by the state district court, which under the conditions is not only authorized but has the responsibility to rule on the matter in accordance with the applicable law on an individual item or collective basis. See *Dorgan v. Kouba,* 274 N.W.2d 167 (N.D.1979).

The defendants contend that the state court erred in not allowing them to plead the fifth amendment regarding their activities pertaining to the fire in Canada. The defendants argue that arson is a crime under Canadian law and is an extraditable offense under the extradition treaty between the United States and Canada. See

Ch. C–34, Rev.Stat. Canada §§ 389 and 390, and Ch. E–21, Rev.Stat. Canada. They point out that Canada has no statute of limitations for arson.[8] As such, a threat of criminal prosecution in Canada against the defendants, including Runck, exists and if that becomes a reality the answers they are required to give could be used against them individually.

The defendants also assert that the communication from Canada expressing an intent not to prosecute is not an assurance because Canada could change its mind without any difficulty and then prosecute them.

The overriding constitutional issue in this respect is: Does the fifth amendment apply to possible foreign prosecution? If it does, what is the answer where the privilege has been supplanted with immunity by either a grant or by the witness being compelled to testify?

■ It is now fairly well settled that the fifth amendment privilege against self-incrimination protects both state and federal witnesses under state as well as federal laws including military laws of this country. *Murphy v. Waterfront Commission of New York,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); *Cooke v. Orser,* 12 M.J. 335 (CMA 1982). The same applies where either a state or federal court compels a witness to testify and as a result the witness has immunity except as to perjury under NDCC § 31–01–09. Neither may use the compelled testimony against the witness. *New Jersey v. Portash,* 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979); *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); and *Murphy, supra.*

In a related issue, the court, in *United States v. Nemes,* 555 F.2d 51 (2d Cir. 1977), held that whenever a witness who testified

---

**7.** We are aware that certain cases involving the United States Constitution or statutes are processed through both state and federal courts in that sequence. We cannot say that as a result justice has been improved. In this instance the process in the federal system has not been exhausted or completed. See also, *England v. Louisiana State Bd. of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

**8.** In support of their argument the defendants quote from "Canadian Abridgement" (2nd ed.) Vol. 11, Criminal Law, § 9889, 1968 publication, as follows:

"Section 9889. General Rule. Unless there is a statutory provisions for it, there is no time limitation on prosecution for an offense. At the common law, no time runs against the Crown."

under grant of immunity is prosecuted the government has the burden of showing that the evidence it proposes to use is derived from a legitimate source wholly independent of compelled testimony.

While the federal and state authorities recognize and respect the effect of immunity granted to a witness and also recognize the prohibition against using court-compelled testimony, we cannot say the same understanding and respect exists between nations. Neither does international law provide a plausible solution. A treaty between nations involved could provide for a similar relation and understanding that exists between the federal and state governments. However, no such treaty between the United States and Canada has been called to our attention and we are unaware of any. The treaty with Canada mentioned earlier does not cover this topic.

As an ad hoc solution the resident state of the witness could refuse extradition on the grounds that the witness had immunity from either a grant or by having been compelled to testify. But we have a treaty with Canada to extradite. Furthermore, the extradition process is basically an executive function and we doubt if the judiciary constitutionally could unilaterally or on an ex parte basis command the executive officer not to honor the requests for extradition. Possibly a voluntary understanding could be reached between the judiciary and the executive on the basis that the government is partially responsible for having created the situation resulting in immunity for the witness by a grant or otherwise. Again, we have no indication that such comity would be recognized or could be employed by the executive branch in this situation because a treaty with Canada on extradition exists. This also raises the question as to other nations whether these concepts require a reciprocal understanding (treaty) or if they may be implemented on a unilateral basis. We suggest that a unilateral implementation would only compound the apparent problems.

These concepts, presently, are no more than embryonic ideas which may be devel-oped in the future but they are unavailable to solve the problems now under consideration either partially or otherwise.

Under the present posture, we need to determine if or to what extent the fifth amendment privilege applies to foreign prosecution. This question was before the United States Supreme Court twice, once in *Parker v. United States*, 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970), and again in *Zicarelli v. Investigation Commission*, 406 U.S. 472, 92 S.Ct. 1670, 1672, 32 L.Ed.2d 234 (1972). In both instances the Court found it unnecessary to answer the constitutional question and left no indication or clue as to what the answer might be. In *Parker*, the United States Supreme Court found the question to be moot, and in *Zicarelli* the constitutional question was not reached.

*In re Parker*, the Tenth Circuit Court of Appeals, 411 F.2d 1067, 1070 (1969), said:

"It is true that Mr. Justice Goldberg, writing for the majority in *Murphy, supra*, traced the history and importance of the privilege against self-incrimination and in so doing indicated approval of some early English cases where the privilege was thought applicable to a 'foreign jurisdiction' or 'country.' But the Justice's reference to such cases was simply by way of argumentative analogy to this nation's state-federal relationship and carries no further persuasion. The fifth amendment was intended to protect against self-incrimination for crimes committed against the United States and the several states but need not and should not be interpreted as applying to acts made criminal by the laws of a foreign nation. The ideology of some nations considers failure itself to be a crime and could provide punishment for the failure, apprehension, or admission of a traitorous saboteur acting for such a nation within the United States. In such a case the words 'privilege against self-incrimination,' engraved in our history and law as they are, may turn sour when triggered by the law of a foreign nation."

The United States District Court of Texas *In re Morahan*, 359 F.Supp. 858 (1972),

quoted with approval the statement in *Parker.* On appeal the Fifth Circuit Court of Appeals *In re Tierney* (same case as *Morahan*), 465 F.2d 806 (1972), *cert denied* 410 U.S. 914, 93 S.Ct. 959, 35 L.Ed.2d 276 (1973), adopted the *Parker* concept and supported its ruling on the basis that the grand jury proceedings were secret.

*In re Federal Grand Jury Witness, United States v. Lemieux,* 597 F.2d 1166 (9th Cir. 1979), the court followed the rationale used in *Re Weir,* 495 F.2d 879, 881 (9th Cir.), *cert. denied* 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974), and held that the fifth amendment did not shield a grand jury witness from the duty of testifying after having been given a grant of immunity on the contention that the testimony could leak out and subject the witness to prosecution in Mexico and elsewhere.

The United States District Court of Connecticut *In re Cardassi,* 351 F.Supp. 1080 (1972), and the United States District Court, Eastern District of New York, *In re Grand Jury Subpoena of Martin Flanagan,* 533 F.Supp. 957 (E.D.N.Y.1982) memorandum and order (not reported as of now) did not follow the *Parker* case concept.

In *Flanagan* the court had under consideration the government's motion to compel the witness to testify under a grant of immunity and held that the fifth amendment privilege applied to foreign prosecution (Ireland) and denied the motion. Before reaching this conclusion it observed that the grand jury transcript may be disclosed under Rule 6, FRCrimP, and "reliance on the assumption that the government officials will always maintain the secrecy of grand jury testimony is both 'inconceivably disingenuous' (*In re Lemieux,* 597 F.2d at 1168–69), and insufficient to prevail against self-incrimination. *In re Cardassi,* 351 F.Supp. at 1081." However, the *Flanagan* case differs in some respects from the instant case. In the instant case the witnesses were granted immunity and testified before the grand jury. The fear of foreign prosecution was not raised by either Runck or Schulz at the time immunity was granted or when they testified before the grand jury. The holding in *Flanagan* without any reciprocity places the government of Ireland and the individual with a desire to visit and become involved with activities in Ireland in a superior position than the United States government because its penal laws and the individual desires are given a greater priority than the right of our government to obtain testimony in exchange for a grant of immunity under the laws of this country.

In *United States v. Yanagita,* 552 F.2d 940 (2d Cir. 1977), the court, on page 946–947, said:

"... *Zicarelli* makes it clear that one invoking the Fifth Amendment privilege has the burden of establishing, first, that the subject of the government's questions raises 'a real danger of being compelled to disclose information that might incriminate him under the foreign law,' and second that there is a 'real and substantial' fear that prosecution by the foreign government might ensue. Only after the witness meets this burden is the government required to show that the foreign government respects the grant of immunity conferred on the witness in order to compel him to testify. See *Murphy v. Waterfront Commission,* 378 U.S. 52, 79, 84 S.Ct. 1594, [1609] 12 L.Ed.2d 678 (1964).

. . . . . .

"... While appellees might have argued that some specific question posed by the prosecutor would provide important leads from which evidence could have been obtained by Japanese authorities, their wholesale refusal to respond to any questions posed to them at the trial denied them this chance and was unjustified by the speculative nature of their claim. See *In re Parker,* 411 F.2d 1067, 1069 ..."

The court concluded that the threat of foreign prosecution was too chimerical. We note, however, that in the *Yanagita* case no acts had taken place in a foreign country. It was merely claimed that the Japanese government would claim that their actions here in the United States constituted a

crime against Japan. (As noted earlier, the defendants in this case provided us with the Canadian laws on the subject.)

In determining the true and full meaning of the constitutional provision its history is always helpful. Justice Goldberg, in *Murphy, supra,* referred to some early English cases [9] decided before the United States Constitution was adopted, but those cases involved disclosures which would have been incriminating under a separate system of the laws operating within the same legislative sovereignty. Justice Harlan, joined by Justice Clark, in a concurring opinion in *Murphy,* stated the countries involved were considered colonies or the equivalent at the time. As such the broad concept of *Murphy* would apply. Consequently the early English cases are not very helpful or persuasive as to what influence they may have had upon the framers of our Constitution. We believe the framers of the Constitution were aware of the various laws in the European nations and the interpretations placed upon them permitting unwarranted practices, such as torture or inquisitions to compel incriminating testimony and wanted to provide an assurance that the same patterns would not be followed in the United States. This most likely led to the adoption of the fifth amendment which in material part provides:

"No person ... shall be compelled, in any criminal case, to be a witness against himself ...."

No reference is made to any foreign law. In our opinion, statements in a constitution, statute, or rule implicitly apply only to those activities which come within or under the authority of the constitution, statute, or rule, as the case may be, unless expressly stated otherwise. The absence of any reference to any foreign law in whatever form is an indication that the fifth amendment was designed to apply only to the laws of the United States and was not intended to embrace foreign prosecution.

We need to examine only the case law [10] or common law history of the fifth amendment in this country to realize the rocky path [*United States v. Murdock,* 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931); second time before the Court at 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933) ] it had before the *Murphy* decision put it to rest. For a number of years uncertainty existed if and to what extent the immunity given by a state also applied to federal government, and vice versa, if and to what extent the immunity given by federal authorities applied to the states. This question was initially approached on a piecemeal basis, and only after several decisions on the topic and related matters did the Court specifically rule in *Murphy* that this immunity unequivocally and fully applied to both sets of government. We must also realize that the relationship between the states and the federal government is that of "E pluribus unum," one nation consisting of several states and not one of independent sovereign nations.

Realistically, notwithstanding *Yanagita, supra,* the officials of this nation or states cannot be expected to know the various penal provisions written or unwritten of the numerous nations. (However, in this case we have been furnished the Canadian law.) This in itself can lead to endless insoluble problems and could effectively prevent either the federal government or the state government from successfully employing the grant of immunity and the concomitant requirement to testify.

All available indicia militate in favor of the conclusion reached by the *Parker* court that the fifth amendment does not apply to foreign prosecution.

Currently, we are aware of only some of the problems but we do not know specifically what all may be involved and whether

9. See separate concurring opinion by Justice Harlan joined by Justice Clark in *Murphy, supra.* The dates of the English cases prior to the adoption of the United States Constitution were either not directly in point or involved a country in the status of a colony. The first case directly in point was in 1851, *King of Two Sicilies v. Willcox,* 1 Sim (NS) 301, 61 Eng.Rep. 116.

10. U.C.L.A.L.Rev., Vol. 5, # 1 (Jan. 1958).

the solution can be properly and effectively accomplished unilaterally or only through reciprocal action. The concurring opinion of Justice White in *Murphy* illustrates the confusion and difficulties that exist as well as the problems that may develop as a result of granting immunity to a witness by either the state or the federal government which applies both to the state and federal government. If a problem can exist between the state and federal government as to immunity (see *Murdock, supra*) we can well imagine how much greater and complicated the problems will become if the fifth amendment privilege were to apply with full force to foreign prosecution.

In brief, if the privilege were to apply to foreign prosecution it would frustrate the effective use of granting immunity in exchange for testimony, or compelling testimony resulting in a grant of immunity. The laws of other countries or nations would actually be controlling in such a situation, rather than the wishes and laws of the state or federal government. This can become more complicated if we realize, which we must, that not all nations are friendly to the United States, and some are anything but friendly if not outright antagonistic.

The problems referred to are somewhat illustrated by the situation created in the instant case. Runck, after pleading guilty to two counts of mail fraud which occurred prior to the Canadian episode, was sentenced on 26 June 1978. His brief states: "[He] testified before a federal grand jury in Minnesota under a grant of immunity." (9 February 1979). The plaintiffs' brief states: "Runck implicitly acknowledges as appellees argued to the district court, that any state or federal prosecution for this offense in this country is barred by both grant of immunity and by the running of the applicable statute of limitations."

From the record made available to us it appears that at the time he testified before the United States grand jury he did not raise the fifth amendment privilege regarding foreign prosecution. The testimony he gave related to and covered some of the activities regarding the "arson" fire in Canada. The immunity given to him then is and will continue to be in effect. Neither the briefs nor the oral argument suggest that Runck was given limited immunity. Once having testified with immunity on the topic pertaining to a foreign crime, can he now in a civil case claim the alleged privilege against foreign prosecution? Does the law, either by the constitution or otherwise, give the witness such a choice? He has been rewarded by having been given immunity against both federal and state prosecution on the matter to which he testified. Can he now refuse to testify and renege on the agreement he had entered into? We believe he is in a poor, if not in an untenable, position to now refuse to testify on the grounds that his testimony might subject him to possible foreign prosecution because that same risk was present when he testified before the grand jury.

If the danger of foreign prosecution constitutes a valid basis for refusing to answer pertinent questions, the rationale and doctrine which served as a basis for the grant of immunity as expressed in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and *Zicarelli, supra*, would in effect be overruled and the purpose and basis for granting immunity would be frustrated, if not defeated. Some of the reasons and justifications for immunity statutes are set out in *Kastigar* and in footnotes 13 through 21; see also footnote 23 for citation of the 1970 Act relative to immunity of witnesses, 18 U.S.C. §§ 6001 to 6005. A grant of immunity invariably is based on something in exchange. Usually it is testimony. The grant of immunity is generally negotiable between the government and the witness and as a result may be limited. Neither the arguments or briefs suggested that the immunity granted to Runck in this instance was limited or qualified.

In the absence of any expressed or implied limitation a witness may not refuse to testify under the fifth amendment privilege if the privilege has been supplanted with immunity.

Of course, Runck might assert that when he testified he had reason to believe that the grand jury transcript and material would be kept secret. *United States v. Postal*, 559 F.2d 234 (5th Cir. 1977); *In re Trevor Davies Baird*, 668 F.2d 432 (8th Cir. 1982). However, he should also have known that the federal transcript and material could be released on proper application pursuant to Rule 6(e)(3)(C)(i), FRCrimP. *Ignoratia legis neminem excusat.* Present counsel was not counsel at that stage.

Even though we believe a mutual pact with some nations would be desirable we do not have the authority to fashion or develop a mutual understanding or an agreement with other nations as to when and under what conditions immunity should be granted and at the same time provide safeguards against the granting of unwarranted immunity for a petty offense which in reality could turn out to be a grant of immunity for a serious capital offense. Neither do we have the authority to require Canada or any other country to recognize our grant of immunity. This is a matter that should be covered by treaty and comes under the jurisdiction of the federal executive and legislative branches of government.

■ We are aware of the problems that existed between the individual states and the federal government before they were resolved by the courts and appropriate legislatures. These problems occurred even though the states and federal government were under the same legal umbrella, the Constitution of the United States, which contained the fifth amendment. Furthermore, each state had a similar "fifth amendment" provision in its Constitution. With this in mind, we realize how much greater and more difficult the problems between nations are or can be. However until treaties or mutual understandings between this nation and other countries become a reality we are constrained to conclude that the fifth amendment privilege cannot be asserted by a witness on the grounds of possible foreign prosecution. On the basis of this conclusion an immunized witness may not rely upon a foreign penal law to invoke the fifth amendment privilege.

■ This concept applies to Runck and Schulz because they were granted immunity and as such could rely only upon the foreign penal law to invoke the privilege. But in our opinion the fifth amendment privilege, in the absence of a treaty or understanding, does not apply to possible foreign prosecution.

■ However, a different situation exists regarding Sobania. Generally a witness not having any immunity need not disclose any specific law to invoke the fifth amendment privilege. The record reflects that Sobania did not receive immunity, therefore he need not disclose whether it is a foreign or local law upon which the fifth amendment privilege is invoked.

In conclusion and in accordance with our opinion, we affirm the orders of the state district court dated 15 July 1981 except as to those parts that refer to and deny the motion to suppress the grand jury transcript and material, on which we abstain.

ERICKSTAD, C. J., VANDE WALLE and PEDERSON, JJ., and EVERETTE NELS OLSON, District Judge, concur.

OLSON, District Judge, sitting in place of PAULSON, J., disqualified.